## THE R. D. BIBBER.

### KENEDY *v.* THE R. D. BIBBER.

*(Circuit Court of Appeals, Fourth Circuit.* **May 25, 1892.)**

No. 8.

SHIPPING—DAMAGE TO CARGO—STRANDING—NEGLIGENCE.

A schooner loaded with a cargo of rails, transported under a bill of lading which excepted liability from "dangers of the seas," arrived off the bar at Galveston harbor. Quicksands cause the depth of water on this bar to constantly vary, and it is not uncommon for vessels to ground in crossing. The master consulted with the local pilots and with his broker, and by their advice lightered 100 tons of his cargo. Being then assured that the vessel would cross in safety, he proceeded in charge of a pilot, but the vessel, from some unknown cause, went fast aground. That night a storm arose which lasted two days, and drove the vessel half a mile from the channel, and on some shoals. From these she was afterwards taken off by salvors. The cargo owner paid salvage on the cargo, and brought suit against the vessel to recover the same; alleging that the stranding was caused by the negligence of the master in not further lightering the schooner before attempting the bar. *Held*, that the grounding of the schooner was not due to the negligence of her master; that, even were it due to his negligence, still that was but a remote cause of the salvage service, the proximate cause, which alone the law regards, being the storm, and from damage caused by that her bill of lading protected the ship.

Appeal from the Circuit Court for the District of Maryland.

In Admiralty. Libel by Mifflin Kenedy against the schooner R. D. Bibber. Decree dismissing the libel. Libelant appeals. Affirmed.

*Brown & Brune, Treadwell Cleveland, Arthur George Brown,* and *William V. Rowe,* for appellant.

*Robert H. Smith,* for appellee.

Before BOND and GOFF, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge. The schooner R. D. Bibber received in Philadelphia a cargo of 780 tons of steel rails, to be delivered in good condition at Galveston, Tex., subject to the usual exception of the "dangers of the seas." With this cargo she drew 13 feet 9 inches aft and 13 feet 6 inches forward. She reached the outer harbor of Galveston on the 17th of January, 1887, and came to anchor. On a voyage a few months before she had taken a cargo of 780 tons of rails to the same port, and, without lightering, had passed over the bar of that port, safely, into the wharf. On this second trip her master went ashore to the office of the pilots in Galveston, to inquire about the depth of water on the bar. Informed that this was 13 feet 6 inches on a tide, and having consulted his broker, he engaged a lighter, and went out with it to his vessel on the morning of the 18th, and took off 100 tons of rails; by doing which the draft of his vessel was reduced to 13 feet 3 inches aft and 13 feet forward, as indicated by the marks on her sternpost and stem. There-

upon he again went ashore, on the evening of the 18th, again to consult with the pilots whether still further to lighter his ship. The freight on the rails was $3, the cost of lightering $2, per ton. The pilots and his broker concurred in advising the master that, if his vessel were put in trim, he could safely cross the bar as she was then loaded. He returned next morning, and set his crew to putting the schooner in trim, completing the task at half past 1 on the 19th. A pilot he had engaged then came with a tug to conduct his vessel across the bar into port. This pilot had, during the morning, taken two other vessels across, one of them drawing 13 feet 3 inches and the other 13 feet 4 inches. The Galveston pilots keep one of their boats engaged every day with the lead, and a flag on that boat indicates the depth of water on the bar. On the 19th of January the depth indicated by this signal was 13 feet 6 inches from morning down to and including the time when the Bibber was in tow on that afternoon, making across the bar. When the pilot that had been engaged came to the Bibber, he asked about her draft, saying that it must not exceed 13 feet 5 inches. He was assured that it was not greater than 13 feet 4 inches. The schooner's hawser was then taken by the pilot's tug, and they set out for port. Just at this time another schooner, in charge of another pilot, drawing 13 feet 6 inches, passed in, across the bar, without touching. About the time the Bibber had got inside the beacon, and near the red buoy which marks the channel over the bar from the outer harbor, she struck bottom. This was about 3 o'clock on the afternoon of the 19th. Vigorous efforts were made to pull her off, and were continued for an hour or two, without avail, and were finally abandoned about 5 o'clock. The master then went ashore to engage another tug and a lighter for the next morning, and remained overnight on shore, leaving the schooner aground on the bar. At the time the schooner had grounded the tide was "just on top high water;" that is to say, at dead high tide, at the stationary stage at which a vessel gets no lift from a current in either direction. During the night of the 19th, an eastern storm came on, which "blew very heavy." It continued from the night of the 19th to the morning of the 22d. It prevented a tug and a lighter from coming out to the schooner on the morning of the 20th, by which time the storm had carried this vessel half a mile from where she had grounded in the channel, to the knoll and shoals on Bolivar point, and into water of only about 6 feet depth. By the afternoon of the same day the sea had become very rough, and the crew of the schooner were brought off on a pilot boat sent out by salvors, except the second mate, who remained on board. On the 20th, after the schooner had been driven by the storm upon Bolivar shoals, as described, her master began negotiations for the services of salvors for vessel and cargo, which were not concluded until the 22d. Nevertheless, the salvage services had been commenced on the afternoon of the 20th, and were brought to a successful end on the 22d. All the cargo was saved, and also the schooner itself; the latter in a condition more or less damaged. The salvage contract was for 50 per cent. of the values saved. The salvage upon the vessel was paid without suit,

upon an agreed valuation. That upon the cargo was made the subject of a libel in admiralty in the United States district court for the eastern district of Texas, which decreed for the libelants. This decree was affirmed on appeal by the circuit court of the same district. The salvage thus determined, amounting, with costs, to about $13,000, was paid by the owner of the cargo, who afterwards libeled the schooner in the district of Maryland, to obtain a reimbursement of the money paid on the salvage contract under the decrees mentioned. In this last suit the district court of Maryland decreed against the owner of the cargo, dismissing his libel, and he has brought the case here on appeal.

At Galveston it is a common occurrence for vessels crossing the bar to touch on the bottom, and sometimes to hang there for a greater or less time. The evidence shows as to touching that as many as 9 out of 10 the vessels crossing the bar touch and drag, but, as the bottom is a fine quicksand, no damage results. In that harbor the variation of tide is only about a foot, and there is generally but one tide in 24 hours. The mere grounding of a vessel on the bar is not in itself a very serious occurrence.

The evidence embodied in the record of this case is quite voluminous, and somewhat conflicting, but the leading facts are set out in the foregoing summary. The briefs filed by counsel on either side are devoted to the discussion of this evidence, exclusively with reference to the question whether the grounding of the schooner was owing to the negligence of the master or his pilot. The cause of the grounding is not proved by either party to the suit. It is wholly unknown, and remains now as it stood before any evidence was taken, a subject of mere conjecture; each of several witnesses having a surmise of his own, each different from the rest.

The complaint of libelant is that the salvage was caused by the master's negligence in not taking off more of the cargo in the outer harbor than he did. The rails were shipped to be delivered at Galveston. Crossing the bar below that port was necessarily in the minds of the shipper and carrier at the time of the shipment. As a matter between men of business, it could not have been understood that more of the cargo should be lightered than was necessary to reduce the draft to the depth of water on the bar, inasmuch as the cost of lightering was two thirds as much as the carrier was to receive per ton for the entire voyage. How much should be taken out was a question of reasonable care and prudence. Respondent maintains that this degree of care and prudence was exercised; proves the draft of his ship and that of the channel on the bar; and proves also that three other schooners, one of the same, and two of greater, draft than that of his vessel, crossed the bar about the time when the Bibber attempted it, without touching, thereby warranting the implication that the grounding was not because of excessive draft in this schooner. No proof of the cause of the grounding is made, the real cause being still unknown. In bringing his vessel into a strange port over a bar formed of treacherous quick-

sands, so uncertain in its condition that a pilot boat is stationed daily upon it, engaged in unceasing soundings with a lead, the master of this schooner acted upon the advice of local pilots, and others competent to give it; he himself concurring in their opinion, and exercising, not only reasonable, but extraordinary, care; being, as part owner of the ship, pecuniarily interested in what he was doing. The carrier of goods is bound to exercise the care which a prudent man exercises in his own affairs; that care and diligence which the case in which he is acting reasonably demands; and where, as in the case under consideration, it is a question whether the injury occurred by the negligence of the carrier or by the danger of the seas, then the principle laid down by Lord DENMAN in *Muddle* v. *Stride*, 9 Carr. & P. 380, cited by the supreme court in *Clark* v. *Barnwell*, 12 How. 280, applies; the principle, namely, that "if, on the whole, it is left in doubt what the cause of injury was, or il it can as well be attributable to the perils of the sea as to negligence, the plaintiff cannot recover." In the present case the court below, upon a careful review of the evidence, held that the grounding of the schooner was not from negligence; and we think that, under all the circumstances which attended that occurrence on the occasion under consideration, the accident was not due to negligence on the part of her master, but, on the contrary, was the result of dangers of navigation incident to that harbor, belonging in class to those "dangers of the seas" from which the bill of lading given in the case by the ship expressly exempted her. But, even if this conclusion were wrong, still it is a mistake to treat the grounding of the schooner as the cause which rendered necessary the services of salvors to her cargo. That was the remote, but not the approximate, cause of the salvage service. It is neither an unusual nor a necessarily perilous thing for a ship temporarily to ground in the channel on that bar. A little delay, an additional tug, and sometimes a lighter, are generally the only consequences of such an occurrence. Had no storm supervened, the schooner and her cargo would have been safely in port on the morning after the grounding. But, while lying aground in the channel, the storm came upon her, lifted her from her safe position, bore her off over shallows for half a mile, and cast her upon the shoals of Bolivar point. It was this work of the storm which brought the schooner and cargo to the necessity of availing of the services of salvors. And so if there had been the most palpable negligence on the part of the master of the schooner in grounding her on the bar in the channel, that fault would not have entitled the libelants to recover damages on a bill of lading exempting her from liability for "dangers of the seas." The grounding was the remote, the storm and its work the proximate, cause of the damages that were sustained, and the law looks at immediate, and not remote, causes in dealing with such cases,—*causa proxima, non remota spectatur.*

A leading case on this subject is that of *Railroad Co.* v. *Reeves*, 10 Wall. 176, in which the suit was for damages for the nondelivery and loss of tobacco which had been shipped by railroad from Salisbury for Memphis. In passing through Chattanooga there was a delay of two days

or more, when the cars on which the tobacco was were caught in a great freshet in the Tennessee river, and swept away, and the tobacco lost. The supreme court held that, "where there is a loss of which the proximate cause was the act of God or the public enemy, the common carrier is excused, though his own negligence or laches may have contributed as a remote cause." It held that the loss was from the freshet, and that, whether the delay at Chattanooga was negligent or not, the carrier was not liable. The court in its opinion cited *Denny* v. *Railroad Co.*, 13 Gray, 481, to same effect. In the case of *Scheffer* v. *Railroad Co.*, 105 U. S. 249, the supreme court held that the proximate cause of the injury sued for must be looked to, and not the antecedent one. The case went from the eastern district of Virginia, and was a suit by the personal representative of an intestate, who had been injured in the head in a railroad collision, caused by the gross negligence of a conductor. Eight months afterwards the injuries received brought on insanity, in a fit of which the lunatic killed himself. Here was a case in which the remote cause of the death was gross negligence on the part of the defendant railroad company, but the proximate cause an act of suicide. The court below sustained the demurrer of defendant to the declaration, reciting the facts, and the supreme court on appeal affirmed the judgment below. In the case at bar the storm was the proximate cause of the subjection of the schooner and cargo to salvage services, and the grounding, whether through negligence or not, the remote cause, and the vessel is not liable. The decree below is affirmed.