## THE STARTLE.

(Circuit Court, D. Delaware. April 21, 1902.)

1. TOWAGE—OBLIGATION OF TUG—LIABILITY FOR LOSS OR INJURY OF TOW.

A tug which undertakes a towing service is not an insurer of the safe delivery of the tow, but the obligation imposed on it by the law is that it shall be reasonably adequate to the service undertaken, and that those in charge shall possess and exercise the skill and care ordinarily exercised by those having experience in the same service. Where the master is shown to have been an experienced and competent man, much must be left, as occasion arises, to his judgment and discretion in the management of the tow, and the burden rests upon the owner of the tow to prove that its loss or injury was due to negligence on the part of the tug to render the latter liable therefor.

2. SAME.

The fact that a tug did not report for service in taking out a tow at the time agreed upon, and did not start until several hours after the appointed time, when the tide was not so favorable, will not support an action for an injury to the tow on the voyage where the owner accepted the service of the tug after her arrival, and the tow was then taken out with his consent.

3. SAME—INCIDENT CAUSES OF INJURY.

Delay by a tug in proceeding with its tow, or other errors in navigation, although negligence, will not render it liable for an injury to the tow caused by the breaking away and loss of some of the boats while anchored, where there was no direct causal connection between such acts and the loss, which resulted directly from intervening causes.

4. SAME—GROUNDING—INCOMPETENCE OF PILOT.

Where at the time of making a contract for towing a fishing fleet in Delaware Bay the master of the tug stated that he was wholly un-

acquainted with the waters at a certain part of the route, and the owner of the fleet agreed to put one of his men on board as a pilot when such place was reached, which he did, such pilot was not the agent of the tug, but of the owner of the tow, and the tug cannot be held in fault for grounding through his ignorance or incompetence, after the master had placed him in charge of the navigation at the place designated.

**5. SAME—EVIDENCE CONSIDERED.**

Evidence considered, and *held* not to establish a charge of negligence on the part of a tug which rendered it liable for the loss of a part of a fishing fleet in tow, which broke away from others of the boats while anchored at night, when the weather was not stormy, and from a cause not appearing.

In Admiralty. Suit against tug to recover for loss of tow. On certificate from the district court for the district of Delaware.

George A. Elliott and Benj. Nields, for libelant.

Flanders & Pugh, for respondent.

GRAY, Circuit Judge. The facts in this case appear to be as follows: Some time in March, 1896, the libelant had a conversation with Capt. Byrne, of the tug Startle, at Delaware City, in which he asked him whether he would tow the libelant's fleet, consisting of two scows and twelve or fourteen sturgeon boats, from Delaware City to the mouth of Mispillion creek, when he, the libelant, was ready to go. Capt. Byrne said he would be willing to do so, and asked the price that libelant usually paid for such service. Upon being told, Capt. Byrne said he would be willing to take the tow down for the sum named. Libelant then asked him if he were acquainted with the water on the western side of the bay, below Mahon's ditch. He said he was not familiar with the water below that point. Sadler, the libelant, testifies that he then told him "that we usually had in our crew some fishermen who were acquainted with the water below there, and that we would render—that is, I would render—him what assistance I could in that way." Capt. Byrne, in his testimony, says that when he told him he was not acquainted below Mahon's ditch, libelant said, "So far as that is concerned, I will put a man aboard that knows every inch of the way;" that he gave the man's name as Collins.

On the 31st day of March, libelant telephoned to one Hughes, the agent of the tug in Philadelphia, that he would be ready to leave Delaware City early next morning, April 1st. As the tug did not arrive in Philadelphia until late that night, she did not start for Delaware City until about 4 o'clock in the morning of April 1st. She arrived there between 7 and 8 o'clock of that morning, and, while the tow was making ready for her, took on a small supply of coal, the libelant cautioning the captain that he must not take on more than was absolutely necessary, on account of the shallowness of the water into which they were going. The captain asked the libelant for the pilot he had promised, and the man named Collins, who was working on some of the boats composing the tow, was pointed out by libelant and told to go on board the tug, which he did. The libelant says that the tug was much later in arriving at Delaware City than he expected, and that he spoke to the captain about the lateness of the hour and the

resulting disadvantage in the stage of the tide. No objection, however, was made to proceeding at once on the voyage down the bay. After geting below Reedy Island, the captain determined, on account of a freshening easterly wind and thickening weather, to make for the eastern side of the channel, and after he had reached Cohansey creek, determined that it was best to put into the creek until the weather should moderate, and start out, if possible, at 3 o'clock the next morning on the high tide. The captain testifies that he consulted with Collins, and that Collins agreed with him that it was the right course to pursue. During the evening, a large fleet of oyster boats came into the mouth of the creek, for harbor, anchoring at various places, and remained there until 6 or 7 o'clock the next morning. On this account, the tug waited until about 8 o'clock before starting out, the captain and those on board the tug agreeing in the opinion that it would have been almost impossible to have taken such a tow through the fleet of oyster boats with safety. Capt. Pierce, who testified as an expert, was also of this opinion. On going out to the mouth of the creek, owing to the lowness of the tide, the tug stuck on the bar, and had to wait until the tide had raised sufficiently to go over it, which it did about 11 o'clock.

The tow arrived on the westerly side of the bay, opposite Mahon's ditch, between 12 and 1 o'clock on Thursday afternoon, April 2d. The captain of the tug then called Collins to the wheel, telling him that he "did not know any more,"—that is, he was unacquainted with the waters from Mahon's ditch down to Mispillion creek. Collins took the wheel, and proceeded down the bay until the tug was about opposite the Mispillion light, when it ran aground. The tide was running down, and the wind blowing in the same direction, the tow swung around the stern of the tug, one of the houseboats going to starboard and the other on the port side. Young Sadler, the son of libelant, jumped off the houseboat onto the tug, and helped clear up the lines, so as to allow the boats to float past the tug, which they did, drifting with the tide, until they were held up by the lines which were then fastened to the bow of the tug. These lines were soon afterwards cast off, with directions to the tow to drop an anchor on the leading houseboat, which was done, the tow bringing up to the anchor a short distance from the tug. The statements of the witnesses, as to the distance between the tow and the tug, vary, in estimating it, from 300 feet to half a mile. As the tide was ebb, the tow straightened out down the bay, in the reverse position to that which it had had before the tug grounded.

There is some dispute as to why the lines were cast off the bow of the tug, after she struck and the tow had passed her. It seems, however, immaterial whether the captain ordered them off, or whether they were cast off by order of the libelant's son, who was on board the tug, as, manifestly, to have kept the tow fastened to the bow of the tug would have tended to make it more difficult to back off as the tide arose, as the strain of the lines from the tow to the bow of the tug, would have been in the direction of hauling her further on to the place where she had grounded. The tug grounded about 4 o'clock in the afternoon, and was able to back off about 9 in the evening.

There is much discrepancy in the testimony as to the weather conditions from the time the tug again floated until the next morning, those on the tow saying that the night was fair, and the breeze light, while the captain and crew of the tug speak of a fresh breeze from the northwest, and considerable sea all night. All unite, however, in saying that the breeze increased towards morning, and that by daylight the weather was bad. During the night, but at what hour no one is able to testify, for no one on the tow seems to have been watching at the time, several of the fishing boats broke loose and were carried away with their nets and fishing apparel, and the smaller of the two houseboats was injured.

This constitutes the loss, to recover which this libel against the tug has been filed. The captain, the mate and the deck hand on the tug agree in testifying that, after the tug had backed off of the shoal, about 9 o'clock in the evening, she attempted to approach the tow and to communicate with those on board. They say that they could not go much nearer than they were when they were aground, as the tug again touched the bottom in going towards the tow. They all testify that they stayed as near as they could, blowing the whistle constantly in order to obtain a signal from those on board, but obtained none and saw no one. The tug then went off in a northerly direction, a short distance, about 300 yards according to the captain, or half a mile or three-quarters, according to the mate and deck hand, and anchored for the night. These same witnesses all agree in their testimony, that the next morning, which was Friday, on the high tide, the tug again approached the tow as near as they could, going until they touched the bottom, and were again unable to communicate with those on board, receiving no signal from any one. This, they say, they repeated each high tide until Sunday morning, when a small boat from the tow carried a line to the tug, and the houseboats and what remained of the fishing boats were towed to their destination at the mouth of Mispillion creek. The tow had a small boat afloat, available for communication with the tug, and it seems as if there was a tacit understanding that it was relied on for that purpose. The tug had a lifeboat on top of its house, which could not be conveniently launched.

The libel alleges a specific contract between Capt. Byrne, master of the tug Startle, and Albert N. Hughes, agent for the tug, whereby and in consideration of the sum of $40, to be paid by the libelant, the said Byrne undertook to tow safely and with reasonable diligence, the houseboats and fishing boats from Delaware City to and into the mouth of Mispillion creek, in the Delaware Bay, the said steam tug to start with her tow at 2 o'clock in the morning of the 1st day of April, in order to take advantage of the tides and to tow said scows and fishing boats safely to the point of destination.

The libel alleges, secondly, that in violation of said towage contract, the said tug did not start from Delaware City at 2 o'clock in the morning of the 1st day of April, but, through the negligence and carelessness of the said master or agent, did not reach Delaware City and take said scows and fishing boats in tow until after 8 o'clock in the morning, whereby the advantage of the tides was disregarded and lost.

Third. That after said tug had started with her said tow, her master

did not use reasonable diligence in proceeding to said point of destination, but, on the contrary, carelessly and negligently, and without necessity, deviated from the proper course and took said tow to a point on the eastern side of Delaware Bay, to wit, into Cohansey creek, where the tow arrived about 5 o'clock in the afternoon of the 1st day of April, and that the said tug carelessly and negligently remained until about half past 8 o'clock in the morning of the following day, and on leaving said creek ran aground and remained fast until about half past 11 of the same morning, and that the master's attention had been called to the necessity of the tow's leaving that point at high water, to wit, about 2 or 3 o'clock the next morning, and that it was through the negligence and carelessness of the said master, that the said tug failed to take advantage of the tides.

Fourth. Negligence is charged in the tug's not stopping with the tow at Mahon's ditch, after it had crossed the bay to its westerly side.

Fifth. Negligence is averred in the casting off of the tow, or allowing it to be cast off, after the tug ran aground.

Sixth. Negligence is charged in the running aground of the tug; and,

Seventh. It is charged in the tug's not coming to the rescue of the tow during the night.

It nowhere appears in the testimony, that the master of the tug was otherwise than experienced and of good reputation as a navigator; and it affirmatively appears that he had been for more than 40 years in the tug service of the Delaware bay and river, and the positive testimony of the expert witnesses produced by the libelant, was to the effect that he was in all respects a competent navigator. Where this is the case, there is much to be left, as occasion arises, to the judgment and discretion of the master of the steamer having charge of the tow.

The contention so strongly urged by libelant, that there was a special contract between the captain and agent of the tug and libelant, for a towage service that was to commence at 4 o'clock on the morning of the 1st of April, seems unimportant, for undoubtedly, whatever the desire of the libelant was, he accepted the service of the tug at the hour in the morning after its arrival when it was available, and whatever the original intention may have been on either side, the service undertaken by the tug began, with the consent of the libelant, at the hour when it actually proceeded down the river with the tow. No claim, therefore, can be supported on the fact, that the tug did not report at Delaware City at an earlier hour than she did.

The determination to put into Cohansey, whatever may have been the ulterior consequences, was the exercise of a discretion on the part of the master of the tug, which there is no testimony in the record to successfully impugn. With the wind from the east, undoubtedly the westerly side of the bay would have been rough, and the opinion of the captain of the tug, that it would have been unwise to have risked the tow under such conditions on that side of the bay, seems to have been supported by the man, Collins, who was placed on board of the tug, by libelant, as a pilot from Mahon's ditch down to Mispillion. At least the captain of the tug testifies that Collins

agreed that it was the right thing to go to the eastward, and put into Cohansey creek. The mate of the tug agrees in this judgment, as does also Capt. Pierce, an experienced tug captain, who testified as an expert. It is true, that the testimony of some of those on the tow, and of so-called experts summoned by the libelant, is to the contrary, but a mere difference of opinion as to the wisdom of the course taken under the conditions obtaining, is not sufficient to support the charge of negligence or unskillfulness on the part of those navigating the tug. But apart from this consideration, it is true that, even if it were clearly a negligent or unnecessary delay that occurred, in the taking of the tow to its destination, such delay was not the proximate cause of the loss complained of. The boats were lost by reason of intervening causes. It is impossible to predicate the loss of the boats as a necessary and immediate consequence of the delay occasioned by the stop in Cohansey creek on the night of the 1st of April. The same may be said of the contention, that the tow should have stopped at Mahon's ditch and waited for the next morning's tide. Even if it could be said that it was gross carelessness not to have so stopped, it does not appear that this fact had any direct causal relation to the breaking away of the boats, and their loss, after the anchoring of the tow the same night. In this case, as in that of the stoppage at Cohansey, an intervening cause or causes render this negligence too remote for judicial consideration. There are always many antecedents to a given catastrophe, but for the existence of which, the result inquired about would not have occurred; it is, however, only the direct and immediate cause, under the control of human agency, which can be judicially considered. Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Morrison v. Davis, 20 Pa. 171, 57 Am. Dec. 695; Roach v. Kelly, 194 Pa. 31, 44 Atl. 1090, 75 Am. St. Rep. 685; Denny v. Railroad Co., 13 Gray, 481, 74 Am. Dec. 645; Hoadley v. Transportation Co., 115 Mass. 304, 15 Am. Rep. 106; The R. D. Bibber, 2 C. C. A. 50, 50 Fed. 841; The King Kalakau (D. C.) 43 Fed. 172.

This brings us to what seems to be the gravamen of the case, namely, the negligence charged in the running aground of the tug, and that averred in the casting off of the tow, or allowing it to be cast off, after the tug ran aground, and finally, the charge of negligence, in that the tug did not come to the rescue of the tow during the first night after the tug ran aground.

The running aground of the tug, under the circumstances, was not necessarily negligence, and to find it so, it must be clearly proved by the libelant. It is to be observed at the outset, that the service undertaken by the tug was not that of a common carrier, and there is no question of insurance or quasi insurance of the tow while under its charge. This action is not for the nonperformance of a contract to do a particular thing; that is, deliver these scows and sturgeon boats at the mouth of Mispillion creek. It is for a tort,—that is, for the alleged negligence of those in control of the tug, in so managing and navigating her as to have occasioned the loss in question. After this service was undertaken, the law imposed the obligation upon those in control of the tug, that she should be reasonably ade-

quate for the service, that those in charge of her should possess and exercise the skill and care ordinarily exercised by those having experience in the same service, when engaged therein. The want of any of these qualifications, or the absence of the due care required under the circumstances, would be culpable negligence, if, as a direct consequence thereof, loss came to the libelant. The thing, however, does not speak for itself, and the burden of proving such culpable negligence rests upon the libelant.

Recalling the fact, which is nowhere disputed, that the captain of the tug, when first spoken to by the libelant, in regard to taking the tow to Mispillion creek, disclaimed any knowledge of the waters on that side of the bay below Mahon's ditch, and that a man connected with the fishing enterprise of the libelant was proffered by the libelant as a competent pilot, it is hard to conceive how negligence can be imputed to the captain, who relinquished the wheel to such pilot upon leaving Mahon's ditch. The undisputed testimony is, that at that point, the captain of the tug called Collins, who was on board for that purpose, and said: "Here, take the wheel. I don't know any more now." The contention of libelant, that this man was in some way the agent and employé of the tug, is not borne out by the testimony. He was designated by the libelant for this particular service, and went on board at the suggestion of the libelant. The captain did not accept him as his agent or employé, did not pay him, or contract to pay him, but simply put the navigation or steering of the tug from that point down to its destination at the risk of the libelant. Libelant certainly had no right to look to the captain for the possession of a knowledge of those waters which he expressly disclaimed having. The testimony of Collins, that the captain, of his own motion, told him to haul up to the westward just before the tug struck, is denied by the captain, and it is nowhere corroborated by other testimony. The captain, however, does say that, just before the tug went aground, he signaled from its stern to the libelant, who was on the tow, to know whether the tug was on its right course, and that the libelant indicated by a signal that the tug should haul a little more to the westward, which fact he communicated to Collins at the wheel. There is nothing, however, in this testimony, sufficient to reimpose upon the captain of the tug the responsibility of its navigation. The charge of negligence in the libel, based on the running aground of the tug, must, therefore, be dismissed.

There is no evidence in the record sufficient to support the charge of negligence resting on the casting off of the tow, or allowing it to be cast off, after the tug ran aground. Whether the captain peremptorily ordered the lines to be cast off of the bitts in the forward part of the tug, which he denies, or whether they were cast off by the orders of young Sadler, it seems quite obvious that under the circumstances it was not an improper thing to do, for they were cast off with the intention of anchoring the tow, which was done as soon as the anchor could be dropped overboard. The manifest tendency of the hanging on of the tow to the bow of the tug against the ebb tide, would tend to pull the tug farther on to the shoal, or at

least make it very difficult for it to back off. No negligence, therefore, is found as to this matter.

Nothing more could be done after the grounding of the tug until she floated again. The grounding occurred about 4 o'clock in the afternoon. Some time after this happened, and after the tow had been anchored, and it was apparently swinging safely to its anchor with the tide, a bateau came from the tow to the tug and took off young Sadler and another man belonging to the tow. Before they left, it appears that the captain promised to come to the tow after the tug was afloat, or at least to stand by them. Undoubtedly it was the duty of the tug to stand by them, and to take the tow into Mispillion creek as soon as it was safe and prudent to do so. The tug was gotten off the shoal at about 9 o'clock in the evening. Let us see what were the conditions with which the captain had to deal at that time, and with reference to which his judgment was to be exercised. The night was reasonably fair. The wind was blowing from the northwest, moderately. The tow was riding securely to its anchor. Collins, the pilot, who was supposed to know the waters in which they were, and the only one who knew them, had left the tug and jumped aboard the scow as it drifted by, when the tug grounded. It is in evidence that he had betrayed such ignorance, while handling the tug from Mahon's ditch to the place in which they then were, as to justify the captain of the tug in refusing to place further confidence in his capacity as a pilot. The captain then, ignorant himself of how to get into Mispillion creek, had no one upon whom he could rely. He, however, testifies, and there is no one to really contradict that testimony, that after getting off the ground, between 9 o'clock and midnight, he tried to approach the tow, and did, although he almost immediately struck the bottom; that he blew his whistle for a long while to attract the attention of those on the tow, from whom he might have a signal; that though he saw the lights on the tow distinctly, he saw no one and received no signal therefrom. The tow being in apparent safety, he backed off a distance, variously estimated at from a quarter to one and three-quarters of a mile, and anchored. According to those on the tow, the wind did not increase very much until daylight, and the conditions all through the night, from the time the tug went to her anchorage until daylight, must have remained pretty much the same. Yet, during the night, four of the sturgeon boats got adrift and were lost, with their paraphernalia, and the smaller of the houseboats leaked and was in a sinking condition. On the next morning, which was Friday, at high tide, the captain testifies, and the mate and deck hand corroborate him, that he again approached the tow as near as he could without grounding, having struck the bottom once or twice, and endeavored to attract attention, and signaled them to send off a bateau, by which a line could be run from the tow to the tug; that he was again unsuccessful in obtaining any signal, and that as he had no small boat afloat and only a lifeboat on top of his house, he again retired. This was repeated, according to his testimony and that of those on the tug, each high tide until Sunday morning, when those on the tow put

off in a bateau and carried a line to the tug, by which they were towed to the place of destination, the captain having received directions how to steer from a passing fisherman familiar with those waters. The increase in the wind and sea, which came on Friday morning, seems to have occurred after the loss of the boats.

It is true, that witnesses for libelant, including the libelant himself, testified that the tug did not, during the night, after it floated, attempt to approach the tow or to communicate with it, by signal or otherwise. This negative testimony, however, is not sufficient to overcome the force of the positive testimony of those who were on the tug, as to the attempts to approach and the blowing of the whistle, and as the burden is upon the libelant to show negligence by preponderance of testimony, it is insufficient in this case for that purpose. It is to be remembered, too, in this connection, that, according to libelant's testimony, a bateau came over to the tug, after the tow was anchored, for the purpose of taking off persons on the tug who belonged to the tow, and communicating with the captain. As the weather conditions do not seem to have changed during the night, it is hard to understand why communication could not have been again had in this way with the tug, after it floated, if it were desired by those on the tow that an effort should be made to tow them into Mispillion creek that night. The failure to do so, or to make signals from the tow to the tug, would seem to indicate that those on the tow acquiesced in judgment, as to the propriety of remaining as they were during the night.

Under these circumstances, we must inquire of what negligence the captain was guilty, of which the direct and immediate consequences can be said to have been the loss here in question. As the boats got adrift on the first night after the grounding of the tug, and no damage came to the tow after that night, it is needless to inquire as to how far the captain was negligent in not getting the tow away from its anchorage before Sunday. If there was any culpable negligence with which we are concerned in this case, it must have been in the fact that he did not attach himself to the tow and carry it into Mispillion creek on the first night. As we have seen, however, there was nothing in the condition of the weather or of the sea on that night, to indicate special danger to the tow in the place where it was anchored. No particular stress of wind or waves has been shown on that night, to account for the breaking away of the boats,—none certainly, which would reasonably raise an apprehension of that, or any other danger to the tow, in the mind of those on the tug, and make it the duty of the captain to attempt, further than he did, to attach himself to the tow, and take it in the nighttime across the waters which separated him from Mispillion creek, as to the navigation of which he was entirely ignorant. We see nothing in the facts disclosed in the record in this connection, which would justly impugn the fairness of the judgment exercised by him under the circumstances detailed, nothing to show that he acted outside the limits of a fair discretion, in regard to what should be done under the circumstances that surrounded him. Even if, in the light of subsequent

events, the course pursued by the captain of the tug should appear to have been a mistaken one, a mere mistake is not enough to charge the tug with the loss which followed. To make the tug liable, the error must be one which a careful and prudent navigator, surrounded by like circumstances, would not have made. See opinion of Waite, C. J., in The W. E. Gladwish, 17 Blatchf. 82, Fed. Cas. No. 17,355; The Czarina (D. C.) 112 Fed. 541.

What was the precise cause of the four boats breaking away is not disclosed by any testimony in the record. No one appears to have been on the watch, or at least no one appears to have seen the boats at the time of their breaking away. As the night was not stormy, and as the other boats held on, we are at liberty to infer that those lost may have been insecurely fastened; that is, some other cause than the alleged negligence of the tug, in leaving them in that position, even if it were negligence, must have intervened. At all events, it is not found that the libelant has supported his allegation of negligence on the part of the tug, as the proximate cause of his loss, by clear and indubitable proof.

The libel must therefore be dismissed.