EMPIRE STATE CATTLE CO. et al. v. ATCHISON, T. & S. F. RY. CO.

MINNESOTA & D. CATTLE CO. v. SAME.

(Circuit Court, D. Kansas, First Division.   January 25, 1905.)

Nos. 8,155, 8,157.

1. NEGLIGENCE—WHEN ACTIONABLE—PROXIMATE CAUSE OF INJURY.
    To give a right of action for an injury on the ground of defendant's negligence, the injury must have been the natural and probable consequence of such negligence, and such as, under the circumstances of the case, might and ought to have been foreseen.
    [Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Negligence, §§ 69–82.]

2. CARRIER—LOSS OF PROPERTY THROUGH ACT OF GOD—NEGLIGENCE.
    A carrier is not liable for a loss of property in shipment through an act of God, which could not reasonably have been foreseen, although, but for its previous negligence, by which the shipment was delayed, the property would have escaped the danger, and the loss would not have occurred.  In such case the negligence is not the proximate cause of the injury.
    [Ed. Note.—For cases in point, see vol. 9, Cent. Dig. Carriers, §§ 525, 530, 540–542.]

3. SAME—NEGLIGENCE—DIVERSION OF SHIPMENT TO ANOTHER LINE.
    Where a contract for a through shipment of stock by railroad did not specify the lines over which the shipment should be made, but the stock was routed by the initial carrier over certain lines, it was not negligence for an intermediate carrier to divert the shipment to a different line, where, owing to floods, it could not be delivered to or taken by the next connecting carrier, and where no danger of loss or injury by reason of the diversion could reasonably have been anticipated.

4. SAME.
    Defendant railroad company had a large shipment of cattle owned by plaintiffs, to be taken over its line and delivered to a connecting carrier at Atchison, Kan.  Owing to floods, it was unable to reach that place with the shipment, and was also notified by the connecting carrier that it could not receive and forward the cattle from there, because of washouts on its line.  Neither road had yards in which they could be placed at Atchison, and defendant arranged with another company to forward them from Kansas City, and took them there, placing them in the stockyards.  These yards had been in large use for many years, and, while the Kaw river, near them, was known to be very high, no flood had ever extended to the yards.  However, on the night after the cattle were placed therein an unprecedented rise occurred—many feet higher than had ever been known before—doing an immense amount of damage to property of all kinds in the valley, and flooding the stockyards.  To prevent the cattle from drowning, they were driven into overhead viaducts leading from one portion of the yards to another, where they remained for more than a week; a large number dying from starvation, and the remainder being seriously

injured. *Held*, that the proximate cause of the loss was the flood, and that defendant was not chargeable with negligence in not anticipating the same, nor liable for the loss.

At Law.· On motion for direction of verdict.

Botsford, Deatherage & Young and R. E. Ball, for plaintiffs.

A. A. Hurd, O. J. Wood, and Angevine & Cubbison, for defendant.

POLLOCK, District Judge. The above-entitled cases arose over the shipment of about 3,000 head of cattle from New Mexico and Texas points to Evarts, S. D. The petitions of plaintiffs count on a violation by defendant of its duties as a common carrier for hire, resulting in loss to plaintiffs. In the interests of time, by agreement of parties, the cases were consolidated for the purpose of this trial, and are now being tried together.

The answers of the defendant allege the contracts for the shipment of the cattle to have been made in writing by plaintiffs with the Pecos Valley & Northeastern Railway Company, limiting the common-law liability of the defendant. These contracts are set forth in extenso in the answers filed, and are admitted by the pleadings in the cases.

It is the contention of the defendant that the damage and loss for which these actions have been brought by plaintiffs accrued to plaintiffs from a flood in the Kaw river, of such an unprecedented and unexpected nature as to constitute what is known in law as an "act of God." Defendant also files a cross-demand against plaintiff the Minnesota & Dakota Cattle Company, in case No. 8,157, for money paid the stockyards company at Kansas City, and for pasturage on the cattle during carriage.

The trial of the cases has consumed much time, and the largest latitude has been granted counsel for the respective parties in the bringing out of all the facts and circumstances of the cases. The matter is now before the court on requests for instructions. The facts are practically undisputed, and briefly, in substance, are these:

The cattle were shipped by plaintiffs from Kenna, N. M., Bovina and Hereford, Tex., which stations are on the line of the Pecos Valley & Northeastern Railway Company, on the 25th and 26th days of May, 1903, destined to the pastures of the plaintiffs, in the neighborhood of Evarts, in the state of South Dakota. The contracts of shipment are in writing, and are in the usual form of live stock shipping contracts, limiting the common-law liability of the carrier, and were made between plaintiffs and the Pecos Valley & Northeastern Railway Company. The parts of the contracts material to this inquiry are:

(1) "That the live stock covered by this contract is not to be transported within any specified time nor delivered at destination at any particular hour nor in season for any particular market."

(2) "The company agrees to stop cars at any of its stations for watering and feeding where it has facilities for so doing whenever requested to do so in writing by the owner or attendant in charge, and the party of the second part agrees not to confine his stock for longer period than twenty-eight con-

secutive hours without unloading the same for rest, feeding and water for a period of at least five consecutive hours, provided he is not prevented from doing so by storms or other accidental causes."

(3) "The shipper hereby assumes and releases the company from risks of injury or loss which may be sustained by reason of any delay in such transportation of said stock or injury thereto caused by * * * injury to tracks or yards, storms, washouts, * * * or from any and all other causes whatever. The liability of the carrier or any fact essential thereto in any instance or case shall not be presumed, but the burden of establishing such liability is assumed by the shipper in the event of a suit."

It is further stipulated that the conditions of said contract shall apply and inure separately in favor of each of the several connecting carriers. It is further provided in the contract:

"And on so delivering to such connecting carrier, all liability of the company whatever, for carriage of or on account of said stock, shall be thereby ended, it being understood the company assumes no obligation whatever on account of the carriage of said stock beyond its road, and that the company shall not be liable for any damage to, injury of or delay of said stock, or of anything whatever that may happen to the same after such delivery or tender of delivery in case such connecting carrier shall refuse to receive the same. Each carrier in the route shall receive such stock when delivered to it, transport the same over its road to the succeeding carrier in the route, and it is distinctly understood that the responsibility of each carrier shall not begin until it receives such stock from the consignor or from the connecting carrier, and shall cease when it delivers the same to the connecting carrier, or, if the last carrier, at the place of destination."

The contracts entered into do not specify the route of shipment from points of shipment to destination, but the waybills upon which the cattle were shipped, and other evidence, disclose that the cattle were by the initial carrier routed over its own line to Amarillo, Tex.; thence over the defendant's line of road, by way of Wellington, Strong City, and Topeka, to Atchison, Kan.; thence over the Burlington Road to Council Bluffs, Iowa; and from thence to point of destination over the Milwaukee Railway. The evidence further shows that when a part of the shipment arrived at Strong City and another part arrived at Wellington—stations on defendant's line of road—the cattle were unloaded for feeding, water, and rest. The cattle were accompanied at all times by owners of the stock, or their representatives in charge, signing the contracts. During the time the cattle were at these stations on the defendant's line of road for feed, water, and rest, the defendant company was notified by the Burlington Road that on account of washouts on its line near Hamburg, Iowa, it could not receive the shipments at Atchison or carry the same as contemplated. Thereupon the defendant company commenced negotiations with the Missouri Pacific Railway to receive the cattle at Kansas City and carry them to Council Bluffs, Iowa; thus performing the part of the service which it was originally contemplated the Burlington should have performed from Atchison, Kan., to Council Bluffs, Iowa. After the defendant was first notified by the Burlington that it could not carry the cattle as contemplated, the Burlington thereafter notified the defendant that its road was in repair, and that it would receive the cattle. A portion of the cattle were thereupon loaded upon the cars of the defendant company and started forward, when the defend-

ant was again notified by the Burlington Company that its line was again washed out, and it would not receive the cattle at Atchison. Neither the Burlington Railway nor the Atchison, Topeka & Santa Fé Railway had stockyards at Atchison at the time to accommodate the cattle if forwarded there. A portion of the cattle, consisting of 42 cars, were forwarded to Kansas City, and were received and transported by the Burlington Railway. It was arranged between the defendant and the Missouri Pacific that the latter company should receive and transport the remainder from Kansas City. These negotiations delayed the cattle on the 27th and 28th days of May at Strong City and Wellington after their arrival at these points. Thereafter, under the arrangement with the Missouri Pacific, the cattle were forwarded to Emporia, Kan., and from thence, by way of North Ottawa, to Olathe, Kan., and thence to the Kansas City stockyards over the Frisco tracks, and were there received in the night of the 29th and morning of the 30th days of May, 1903. Twenty cars of the cattle were transferred by the defendant to the Missouri Pacific tracks, and were by that company placed at its stockyard chutes, and were unloaded by the stockyards company. The remainder of the cattle were unloaded from the cars where placed by the defendant company in the stockyards. Efforts were made by the representatives of the plaintiffs accompanying the cattle, on the 30th day of May, to have the cattle forwarded to point of destination, but without success. The Missouri Pacific Railway made an attempt to move a portion of the cattle, but did not succeed in so doing; and the cattle were left in the stockyards at Kansas City on the day and night of the 30th of May, and for many days thereafter, as hereinafter stated.

It appears from the evidence that during the greater part of May, 1903, unusual and unprecedented rains fell in the watershed of the Kansas river, which empties into the Missouri river at Kansas City. To such an extent was this true that a vast amount of property located in the valley was inundated and destroyed by high water in the Kaw river following in consequence of such rain. The railways running along and across this valley were overflowed, and the property destroyed. The railway and other bridges crossing the river were in almost every instance carried away by the flood. Many thousands of homes in Kansas City were submerged, and the inhabitants fled to the hills and other places of safety, with nothing saved from destruction but the clothing they had on. Business houses and contents were submerged and destroyed. The water in the river covered the entire valley to a depth of from 10 to 20 feet. Nothing like it ever before occurred in the history of the valley. It was, in fact, as shown by the evidence, a great public calamity to Kansas City and other cities and towns in the valley. The stockyards in which the cattle in question were located were, for the first time in history, inundated on the night of the 30th and the morning of the 31st of May. To save the cattle in question from drowning, they were driven up into overhead viaducts leading from one portion of the yards to another, and were there kept for more than a week, during the continuance

of the flood, without sufficient feed or water, from which cause more than 500 of the cattle died, and the remainder were weakened and greatly injured.

At the time the cattle were carried to Kansas City by the defendant company, its lines of road from Topeka to Atchison and from Topeka to Kansas City were submerged by the flood, and could not be operated. After the subsidence of the flood, owing to the fact that the cattle were in such a starved and weakened condition, the defendant, seeking to minimize the loss and damage to the cattle, and with the consent of plaintiffs, and after the plaintiffs had refused to receive the cattle from the defendant, carried the remainder of the herd to pastures in Lyon county, Kan., where they were held until about the 10th of July following, when they were forwarded by defendant company on the original billing to Atchison, Kan., and from thence to point of destination over the Burlington and the St. Paul Railways. Before removing the cattle from the pastures in Lyon county, plaintiffs gave bond to pay the freight charges at the point of destination, and also to repay the defendant the amount of the charges of the stockyards company for care of the cattle while held in the stockyards (in amount, $2,428.60), and paid the pasturage of said cattle in Lyon county, Kan. (in amount, $2,820.38), which amounts are stipulated by the parties to be reasonable and necessary in the event it should finally be determined plaintiffs were liable therefor. A cross-demand for these amounts has been filed by the defendant against the plaintiffs in case No. 8,157.

The damages sustained by plaintiffs, including the loss of cattle which died, damages the remainder sustained which occurred by reason of their weakened and starved condition when received at point of destination, and extra charges and expenses incurred in the delay in shipment and the holding of the cattle in Lyon county, and the lateness of the season when they reached their destination, are quite large; and, while there is a variance in the amount of damages sustained by plaintiffs, as testified to by different witnesses of the plaintiffs, yet the evidence of plaintiffs in this respect is wholly uncontradicted by any testimony of the defense.

The grounds upon which plaintiffs base their right of recovery in this matter, as specifically set forth and alleged in the petition of the Minnesota & Dakota Cattle Company, are as follows:

"Plaintiff states and charges the fact to be that by the exercise of due and reasonable care in the carriage and transportation of said cattle from the point of shipment aforesaid to Atchison, Kansas, all of said loss and damage could have been avoided, and that defendant was guilty of negligence therein in the following particulars, to wit:

"First. Defendant did not exercise due and reasonable care, but was negligent, in its detention of said cattle at Wellington, Kansas, and at Strong City, Kansas, and, by the exercise of due and proper diligence, could have carried and transported said cattle to Atchison, Kansas, by way of Topeka, Kansas, and delivered the same to the connecting carrier at that point, and thus escaped the peril and destruction of the flood.

"Second. That defendant was guilty of negligence, after having so long detained said cattle at Strong City and at Wellington, Kansas, in not further detaining or holding them in some place of safety until the unprecedented

flood in the Kaw river, hereinbefore mentioned, had subsided, so that the transportation of said cattle might be safely resumed.

"Third. That defendant was guilty of a wrongful and negligent act in diverging and deviating the shipments of said cattle to Kansas City, Missouri, off of the line of transportation over which said cattle were directed by the plaintiff to be carried.

"Fourth. That the defendant negligently and carelessly, and knowing that an unprecedented flood was descending the Kansas river, hauled said cattle into the low lands at the mouth of said river, and unloaded and left them in front of the approaching flood.

"Fifth. That defendant, after having wrongfully transported said cattle to Kansas City, Missouri, as aforesaid, carelessly and negligently failed and neglected to move or cause to be moved the same from their position of peril in the stockyards at Kansas City, Missouri, as defendant had reasonable time and opportunity to do, but the same were overtaken by the flood.

"Sixth. That the defendant did not exercise due and reasonable care and diligence, and was negligent, in not properly or sufficiently feeding and watering said cattle, both while the same were at Strong City, Kansas, and at Wellington, Kansas, and while the same were in the yards and viaducts of the Kansas City Stockyards Company at Kansas City, Missouri.

"Plaintiff further states that all of the several injuries, damages, and losses to and of said cattle hereinbefore specified, and the losses and expenses aforesaid, were each and all caused by the several negligences and want of due and reasonable care in the transportation and carriage of said cattle by the defendant."

The specific grounds of negligence alleged on the part of the plaintiff the Empire State Cattle Company are of identical legal import.

That the flood in question was unprecedented in its character is alleged by plaintiffs in their petitions. That it was extraordinary in its nature is attested by the fact that the water rose many feet higher than ever before known in the history of the valley, and rose very rapidly in the latter part of the night of the 30th of May and the forenoon of the 31st day of May. That it was wholly unanticipated in height and destructive force is manifest by the undisputed fact that millions of dollars worth of property was placed and left in the valley here at Kansas City by the owners thereof, which was inundated and destroyed, much of which could have been carried to a place of safety, had it been possible to have anticipated the calamity. As it was, the owners fled to the hills and other places of safety in conveyances, in boats, and in every possible way, to save their lives and the lives of the members of their families. That the flood was of such unprecedented nature and character in its height, suddenness, and destructive force as to constitute what is known in law as an "act of God" admits of neither doubt nor argument. Does this fact, established by the undisputed evidence in the case, relieve the defendant of liability?

Under the undisputed evidence, what was the direct, efficient, and proximate cause of the loss sustained by plaintiffs? The defendant contends, "the act of God." The plaintiffs contend, "the negligence of defendant." Which contention is correct?

It is not enough in this case that plaintiffs show that some act of negligence of the defendant furnished the occasion for the loss, or that some act of negligence of the defendant contributed to the injury; but, before plaintiffs may recover in these actions, it

devolves upon them to trace the loss which they have sustained to the negligence of the defendant, as the direct and proximate cause of the injury.

While the authorities in this country are not in harmony upon this proposition, yet the federal decisions all agree therein. In Chicago, St. P., M. & O. Railway Company v. Elliott, 55 Fed. 949, 5 C. C. A. 347, 20 L. R. A. 582, Judge Sanborn, delivering the opinion, says:

"The rule of law which governs this case is not difficult of statement, but, like many other rules, the difficulty is solely in its application. 'Causa proxima non remota spectatur.' An injury that is the natural and probable consequence of an act of negligence is actionable. But an injury that could not have been foreseen or reasonably anticipated as the probable result of the negligence is not actionable, nor is an injury that is not the natural consequence of the negligence complained of, and would not have resulted from it but for the interposition of some new, independent cause, that could not have been anticipated. Obviously, the relation of causes to their effects differ so widely and are so various that no fixed line can be drawn that will in each case divide the proximate from the remote cause. The best that can be done is to carefully apply the rule of law to the circumstances of each case as it arises. The effect sometimes follows immediately upon its moving and proximate cause, and, again, that cause works out its effect with unerring accuracy after a long period of years."

In Railway Company v. Kellogg, 94 U. S. 469, 24 L. Ed. 256, Mr. Justice Strong, speaking for the Supreme Court, said:

"It is generally held that in order to warrant a finding that the negligence, or an act not amounting to wanton wrong, is the proximate cause of the injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to. have been foreseen in the light of the attending circumstances."

In Hoag v. Railroad Co., 85 Pa. 293, 27 Am. Rep. 653, it is said:

"The true rule is that the injury must be the natural and probable consequence of the negligence—such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrong-doer as likely to flow from the act."

In the light of these and other authorities, and the undisputed evidence in these cases, have the plaintiffs so alleged and proven?

It is first contended by plaintiffs that the delay of the trains at Strong City and Wellington on the 27th and 28th days of May was negligence, and the cause of the injury to plaintiffs. It is true that if this delay had not occurred, and the cattle had been promptly forwarded to and through Kansas City, they would not have been injured as they were at Kansas City. But it is equally true this delay or failure to longer delay was not the cause of the injury. The question here is, if the carrier delayed the shipment for an unreasonable time, but for which he would have been able to deliver the cattle safely, or to deliver them to a connecting carrier by whom they would have been carried beyond danger from an act of God causing loss, is the carrier liable for the consequences of such delay? Upon this question the courts differ widely. The courts of New York, Illinois, and other states hold the defendant liable in such case. The rulings in the federal court are to the contrary. Insurance Company v. Tweed, 7 Wall. 44, 19 L. Ed. 65;

Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Scheffer v. Railroad Co., 105 U. S. 249, 26 L. Ed. 1070; Railway Co. v. Insurance Co., 139 U. S. 223, 11 Sup. Ct. 554, 35 L. Ed. 154; The R. D. Bibber, 50 Fed. 841, 2 C. C. A. 50; Thomas et al. v. Lancaster Mills, 71 Fed. 481, 19 C. C. A. 88.

Again, it is alleged by plaintiffs that the cattle should have been forwarded, as originally intended, by Atchison, and not by Kansas City, and, if so, that the injury would not have occurred. The written contract of shipment made, as has been seen, does not specify the route to be followed, but upon this question the contract is silent. The route originally contemplated by the parties was to Atchison, and thence by the Burlington. While the cattle were en route to Atchison, and stopped at Wellington and Strong City for feed, water, and rest, the Burlington notified the defendant that, on account of a washout on its line near Hamburg, Iowa, it could not receive the cattle. The cattle were delayed by defendant pending negotiations for a different carriage. During the pendency of such negotiations the Burlington notified defendant that its line was again open. The cattle were ordered forward, and were loaded and started en route. Again the defendant was notified by the Burlington that its line was out, and it could not receive the cattle. A portion of the cattle were again returned and unloaded at the stockyards at Strong City. At the time neither the defendant nor the Burlington had yards at Atchison to accommodate the cattle. Arrangements were completed for the Missouri Pacific to receive them at Kansas City and transport the cattle from there. By this time it was impossible for the defendant to carry the cattle over its line to Atchison, or to carry them to Kansas City otherwise than the way they were carried. That the contract of shipment and the circumstances, common business prudence, and the law, as well, authorized a departure from the originally intended route of shipment, I have no doubt, unless the defendant knew or should have known that by such departure the safety of the shipment would be endangered. Snow v. I. B. & W. Ry. Co. (Ind. Sup.) 9 N. E. 702; Hutchinson on Carriers, § 311; International & Great Northern Railway Co. v. Wentworth (Tex. Civ. App.) 27 S. W. 680. There is no evidence in the cases which in any wise sustains the allegation of plaintiffs that the cattle were not properly fed and watered while at Strong City and Wellington.

Again, it is alleged by plaintiffs that the defendant —

"Negligently and carelessly, and knowing that an unprecedented flood was descending the Kansas river, hauled said cattle into the low lands at the mouth of said river, and unloaded and left them in front of the approaching flood; that defendant, after having wrongfully transported said cattle to Kansas City, Missouri, as aforesaid, carelessly and negligently failed and neglected to move, or cause to be moved, the same from their position of peril in the stockyards at Kansas City, Missouri, as defendant had reasonable time and opportunity to do, but the same were overtaken by the flood."

As to whether the act of the defendant in bringing the cattle to Kansas City, and there leaving them in the stockyards, constitutes such negligence as was the proximate cause of the loss to plain-

tiff, must be measured, not in the light of subsequent events, and as we see them to-day, but by what a person of ordinary care, skill, and prudence would have done in his own affairs, with the knowledge of circumstances and conditions as they were or should have been known to him at that time to exist. At this time it was known the stockyards where the cattle were placed were used for this purpose at all times and at all seasons of the year, and that many millions of cattle had been therein placed with the utmost safety, and that cattle that had been therein placed would be properly cared for by the stockyards company and its employés; that, in all the history of these yards, they had not been overflowed or endangered by overflow; and that the safety of cattle placed therein had not been questioned. "That which never happened before, and which, in its character, is such as not natural to occur to a prudent man to guard against its happening at all, cannot, when, in the course of years, it does happen, furnish good ground for a charge of negligence in not foreseeing its possible happening, and guarding against the remote contingency of its happening." Railroad Co. v. Columbia, 65 Kan. 390, 69 Pac. 338. The officers of the defendant company on Saturday, the 30th day of May, after investigating the conditions around Kansas City, and after considering the information on the subject of the rise in the Kansas river, moved the company's own property and the property in its charge for shipment, consisting of 1,400 loaded cars of freight, upon ground no higher than that where the cattle in question were left, with perfect assurance of safety from the flood, which property and much of the company's most expensive equipment were inundated. So far as shown in this case, all others acted in the same manner. Late that night and during the succeeding day the flood rose rapidly to more than 10 feet higher than ever before known. The property of all alike was inundated and destroyed, and plaintiffs' cattle were by the stockyards company placed in the overhead viaducts to prevent them drowning in the stockyards. In such location, and on account of the flood conditions, the height of the water, the swiftness of the current, the floating of débris, the lack of equipment, they were not, and could not be, properly cared for, and the loss thus accrued. It may be conceded that the cattle need not have been brought into Kansas City in the first instance, or, being in, that they could have been removed in the cars in which they arrived, or in others, or on foot. Guided by events that followed, as now seen by us to-day, the cattle undoubtedly should and unquestionably would have been removed from their place of peril. That these circumstances and acts of the defendant company furnished the occasion for the loss is unquestionable, but that the direct and proximate cause of the loss and damage was the unprecedented and unexpected flood and attendant disaster that came wholly without anticipation on the part of the defendant company, or the plaintiffs and their agents accompanying the stock, is shown by all the testimony in the case. It was a serious loss and great hardship upon plaintiffs, but, in my judgment, it must be borne by them, as like losses are borne by

others with property unfortunately situated in this unhappy valley in that ill-fated time.

It therefore follows, on the main case, the request for instructions to the jury to return a verdict for the defendant must be sustained, and the like request of plaintiffs must be denied. This will be done.

On application of attorneys for the defendant, the cross-petition is dismissed, without prejudice, at cost of defendant.