## RAILROAD COMPANY *v.* REEVES.

1. When a common carrier shows that a loss was by some *vis major*, as by flood, he is excused without proving affirmatively that he was guilty of no negligence.
2. The proof of such negligence, if the negligence is asserted to exist, rests on the other party.
3. In case of a loss of which the proximate cause is the act of God or the public enemy, the common carrier is excused though his own negligence or laches may have contributed as a remote cause.
4. The maxim *causa proxima non remota spectatur* applies to such cases as to other contracts and transactions; and ordinary diligence is all that is required of the carrier to avoid or remedy the effects of the overpowering cause.
5. The mere promise of a carrier, without additional consideration, to forward freight already on the route by an earlier train than usual, is not evidence from which a jury can infer a special contract to do so.

IN error to the Circuit Court for the Western District of Tennessee, the case being this:

Reeves sued the Memphis and Charleston Railroad Company as a common carrier for damage to a quantity of tobacco received by it for carriage, the allegation being negligence and want of due care. The tobacco came by rail from Salisbury, North Carolina, to Chattanooga, Tennessee,

reaching the latter place on the 5th of March, 1867. At Chattanooga it was received by the Memphis and Charleston Railroad Company on the 5th of March, and reloaded into two of its cars, about five o'clock in the afternoon.

The Memphis and Charleston Railroad track extends from Memphis to Stevenson, Alabama, a point west of Chattanooga, on the Nashville and Chattanooga Railroad. Between Chattanooga and Stevenson, by a contract between the two companies, the trains of the Memphis and Charleston road were drawn by engines belonging to the last-named road, an agent of the road being at Chattanooga and receiving freight and passengers there for Memphis.

One Price, who as agent of Reeves was attending and looking after the tobacco along the route, testified (though his testimony on this point was contradicted) that the agent of the company at Chattanooga promised that, if the bills were brought over in time, the tobacco should go forward at six o'clock *that evening;* and shortly before that time informed him that the bills *had* come over, and assured him that the tobacco would go off at that hour. It did not do so, though he, Price, the agent, supposing that it would, went on by a passenger train and so could no longer look after the tobacco. By the time-tables which governed at the time the forwarding of freight, goods received during one day were forwarded the next morning at 5.45 A.M., and at that time the train on which the tobacco in question was placed went off. This train, however, found the road obstructed by rocks that had fallen *during the night* and had to return, and in consequence of information of the washing away of a bridge on the road, *had to remain at Chattanooga.* Chattanooga is built on low ground, on the Tennessee River, which, a short distance west of it, runs along the base of Lookout Mountain. On the 5th of March there had been heavy rains for some weeks, and the river had been rising and was very high. Freshets of the years 1826 and 1847, the highest ever remembered previous to one now to be spoken of, or of which there was any tradition, had not risen by within three feet as high as the level of the railroad track in the station

where the cars containing the tobacco were placed, on their coming back to Chattanooga, after their unsuccessful attempt to go forward.

The river rose gradually *until the evening of the 7th (Thursday)*, at which time it reached the high water mark of 1847. That night it rose an average of four inches an hour from 7 P.M. to 6½ A.M. of the 8th of March, and it continued to rise until about 2 P.M. of Sunday, the 10th of March.  On Friday, at 1 P.M., the engines standing on the tracks were submerged so that their lower fire-boxes were covered.  On Saturday, at 8 P.M., the engines and cars were submerged ten feet or more, and the freight in question was thus damaged.  *Had it gone off on the evening of the 5th it would not have been damaged.*  A freight train did leave Chattanooga going towards Memphis on that evening, but it carried freight of the Nashville and Chattanooga road only, and none for the road of the defendant.  Four or five days elapsed from the time when the water began to come up into the town, before it was so high as to submerge the cars and injure the freight. No one expected the water would rise as it did, because it rose full fifteen feet higher than had ever before been known. The rise was at first gradual, and from the direction of Lookout Mountain, by backing; but afterwards it came suddenly from the direction of the Western and Atlantic road, opposite to its former direction, and then rose very rapidly. Although on the 6th the river was getting out of its banks, there was no apprehension, up to the night of the 7th, that the water would submerge the town.  During the night of the 7th merchants removed their goods, and one Phillips, who that night removed his to the second story of a building standing on ground no higher than the depot, saved them. The water rose into his building on the morning of the 8th. *The people finally fled to the hills, and there was a universal destruction of property as well of individuals as of railroads passing through the city.*  The waters indeed were so high and the flood finally so unexpected that the mayor broke open railroad cars and took provisions which were in process of transportation, to feed the famishing population.  The cars

in which the tobacco was were standing on the highest ground in the region of the station.   There were roads in other directions, beside the road over which the rock had fallen, physically traversable by the cars which had the tobacco; but there were difficulties of various kinds in going on them, which the agents considered amounted to a bar to trying to use them.

On this case the defendant, having by a first and second request, asked the court to instruct the jury that there was no obligatory contract even if the jury believed the conversations deposed to by Price, asked further instructions.

" *Third.* That if the jury shall believe that the train was stopped on the morning of the 6th by the falling of rock on the track and the washing away of a bridge, and was obliged to put back to Chattanooga in order to send force and implements to put the road in repair, then such delay was inevitable, and would not subject the road for any consequential damages, the immediate cause of the damage being the flood.

" *Fourth.* That when the damage is shown to have resulted from an immediate act of God, such as a sudden and extraordinary flood, the carrier would be exempt from liability, unless the plaintiff shall prove that the defendant was guilty of some negligence in not providing for the safety of the goods.   That he could do, so must be proven by the plaintiff, or must appear in the facts of the case.

" *Fifth.* If the freight train carrying the tobacco left Chattanooga on the morning of the 6th of March, 1867, on its proper time under the contract, and was prevented from going forward by obstructions on the track or the washing away of a bridge, caused by an extraordinary fall of rain and freshet, and was detained at Chattanooga by these obstructions, or either of them, until the tobacco was injured by the subsequent freshet, which could not be avoided, then the delay at Chattanooga would not be negligence, and the defendant would not be liable for the injury caused by such subsequent freshet, if such freshet was such as is described in the former request for instructions as an act of God, provided the defendant used all proper diligence to rescue the property from injury at Chattanooga, or provided the freshet was so sudden and overwhelming as to prevent rescuing it."

But the court refused to give any of these instructions, and gave the jury, among others, the following ones:

"2d. If you shall be satisfied from the proof that the tobacco was injured while the cars upon which it was being shipped were standing at the depot in Chattanooga by a freshet which submerged the cars containing the tobacco; and that no human care, skill, and prudence could have avoided the injury, then such injury would be occasioned by the 'act of God,' and the defendant would not be liable. But, if you believe that the cars containing the tobacco were brought within the influence of the freshet by the act of the defendant, or its agents, and that if the defendant or agents had not so acted the tobacco would not have been damaged, then the injury would not be occasioned by the 'act of God,' and the defendant would be liable for the damage sustained.

"3d. If you shall believe that the tobacco was received at Chattanooga by the defendant on the evening of the 5th of March, 1867, and that the agent of the defendant having the charge of the freights at, and superintending their shipment from, that point to Memphis, *made a contract* with Price, the agent of the plaintiff, by which the tobacco was to be sent forward for Memphis on the same evening, and that the agent of the defendant did not comply with the said contract or engagement so made with the agent of the plaintiff, but held the tobacco over until the next morning's train, and, as a consequence of such delay, the tobacco was injured by a freshet in the rivers and creeks contiguous to Chattanooga, and which freshet would not otherwise than by said delay have caused the said injury, then the defendant can claim no exemption from its liability as carriers on account of any injury or damage occasioned by the said freshet, and you will find a verdict in favor of the plaintiff.

"4th. If you shall believe that the tobacco in controversy was not sent forward from Chattanooga, *en route* for Memphis, until the morning of the 6th of March (and this in the absence of any such *contract* as stated in the preceding instruction), and that the train upon which said tobacco was being transported was delayed and hindered in its progress by an obstruction upon the track of the road some two and a half or three miles from Chattanooga, which obstruction was occasioned by a slide or tumbling of a rock from the mountain side along which the track

of the road is located, and in consequence of said obstruction the said train returned to the depot at Chattanooga, when, by a diligent effort on the part of the defendant's agents the obstruction might have been removed and the train gone through to some other point on the road where no injury would have resulted; and if you believe that while the train was so at the depot at Chattanooga the tobacco aforesaid was damaged as alleged, then the returning of the train to Chattanooga was the immediate cause of the injury, and not the freshet; and the injury would not be caused by 'the act of God,' man's agency having intervened, and the defendant would not be relieved from liability, and the plaintiff will be entitled to a verdict in his favor.

"5th. That the loss or damage to the goods in question, if produced by a rise, or freshet, in the river or creeks in the vicinity of the depot where the train was standing, such rise, or freshet, to constitute it 'the act of God,' in a legal sense, must have been so sudden, immediate, and unforeseen as to leave the carrier no sufficient time or means of escape from its consequences. But if it be not shown by the evidence that such was the fact, then it was the duty of the defendant or its agents to save the property of the plaintiff from the impending danger, if it were possible to do so, by extraordinary exertion. If the damage could have been prevented by any means within the power of the defendant or its agents, and such means were not resorted to, then the liability of the defendant would not be relieved, and the jury must find for the plaintiff."

The trial and verdict, which went for the plaintiff, was had March 26th, 1868. On the 15th of April following a motion was made by the defendant for a new trial, and overruled. The record went on, under date of *the 18th of April*, 1868, to say, after giving the title of the case, that,

On *this day* came the defendant by attorney and tendered its bill of exceptions herein, and asked that the same might be signed and sealed by the court and made part of the record in this cause, which was accordingly done.

The "*bill of exceptions, filed April* 18, 1868," then followed. It commenced, after the title of the case, by saying that, "on

the *trial* of this cause, the following proceedings were had." Then came the testimony introduced, the prayer of the plaintiff in error for five distinct instructions, the refusal of the court to grant them, and the instructions which the court did give (all as already mentioned), and the statement that the defendant *excepted* to the action of the court in refusing the instructions aforesaid, and also in giving the charge aforesaid, and also in overruling his motion for a new trial.

The exceptions to the charge of the judge at the trial, and to his refusal to charge as requested by defendant below, presented the only grounds on which error was alleged.

*Mr. P. Phillips, for the plaintiff in error:*

Although the case shows, from the published schedule and the oral proof, that it is impossible that any such conversation as Price states took place between himself and the agent could have occurred, we admit its truth for the purpose of the argument.

But this admitted, there is nothing in the evidence to authorize the court to submit to the jury the finding of *a contract* to forward this freight on the night of the 5th. There was no new consideration. But a consideration is of the essence of every *contract;* of every *obligatory* promise; and so indispensable is it, that it must be always shown, and cannot be presumed.* The loose language of Story, J., in his book on Bailments, as to what constitutes consideration, has no foundation in the common law.†

Whether the agent made the promise or not, the duty of the company was to forward the freight thus received, using due diligence for this purpose, and it had no higher one in consequence of the promise. There was no new agreement at Chattanooga for freight, or for any other purpose. The freight had been arranged at Salisbury, and was to be col-

---

* Hughes *v.* Hughes, Admr. 7, Term 350.

† See American Jurist, vol. xvi, p. 254; American note (tit. Unpaid Agents) to Coggs *v.* Bernard, 1 Smith's Leading Cases, 419, 6th American edition.

lected at Memphis, the terminus.    The promise was a vol
unteer statement merely, *nudum.pactum*.

But admit that there was a contract to forward on the
evening of the 5th, the damage occasioned by the flood on
the 6th cannot be referred to a violation of that contract.
This is the view taken by the Supreme Court of Pennsyl-
vania in *Morrison* v. *Davis*,* and by the Supreme Court of
Massachusetts, in *Denny* v. *New York Central Railroad Com-
pany*, cases analogous, both, to ours.†

All the instructions asked for by the defendant ought
therefore to have been given.    Though the proximate cause
may be occasioned by inevitable accident, the carrier is
still bound to care and diligence.    Yet no greater foresight
of extraordinary perils is expected of him than of other
men, and no greater penalty visited for its failure.    When
he discovers himself in peril, the law requires of him ordi-
nary care, skill, and foresight.    This is defined to be the
common prudence which men of business and heads of
families usually exhibit in matters that are interesting to
them.    As difficulties increase in danger, great care then
becomes the ordinary care of a prudent man.    If one uses
the precautions which a reasonable man would use under
the circumstances, he is not responsible for omitting other
precautions which are conceivable, even though if he had
used them the injury would certainly have been avoided.

*Now as to the question of proof of negligence.*    The rule is
admitted to be that the burden of proof is on the carrier to
show that the loss was occasioned by a cause for which he
is not responsible.    When, however, the evidence brings the
loss within the excepted danger, the *onus probandi* is changed.
It is then upon the plaintiff to show that the danger might
have been avoided by the exercise of reasonable skill and
attention of the carrier.‡

The case shows that due diligence and care were used to
avoid the threatened danger.

---

* 20 Pennsylvania State, 171.    † 13 Gray, 487.

‡ *Clark et al. v. Barnwell*, 12 Howard, 280.

*Messrs. Albert Pike and R. W. Johnson, contra:*

1. It does not appear that any exceptions were taken or points reserved during the trial. The bill of exceptions sets out five *instructions* to the jury, asked by the defendant below, and refused by the court, covering some pages. These the court refused, and gave a charge in regard to the law in general as to the responsibilities of common carriers, and as to the case in hand upon the facts proven.

The bill of exceptions was taken three days after the motion for a new trial was overruled, and twenty-three days after the trial concluded. Now, does the word "excepted" necessarily show that the exception was taken during the trial? It is not said that the company excepted at the time; and the court cannot *presume* that it did, in the absence of any statement, even the most vague, to that effect. On the contrary, as the statement is that the defendant also *excepted* to the overruling of his motion for a new trial, without saying that this was at a different time, the court must hold that there was no exception at all taken until *that* motion was overruled.

Now a bill of exceptions must be upon points expressly reserved and excepted to at the trial, otherwise they are waived, as a bill of exceptions originally was, if not presented at the trial. That was the rule under the statute of Westminster. If the exception was not stated in writing, and tendered at the trial, it was considered as waived, and the party could not resort to it after a verdict against him. *Wright* v. *Sharp*,* is conclusive on that point. Holt, C. J., said there:

"If this practice should prevail, the judge would be in a strange condition; he forgets the exception, and refuses to sign the bill, so an action must be brought; you should have insisted on your exception at the trial; you waive it if you acquiesce, and shall not resort back to your exception after a verdict against you. . . . . *The substance must be reduced to writing while the thing is transacting,* because it is to become a record."

---

* 1 Salkeld, 288.

Little profit accrues to the law by the abandonment of its old principles. It is not safe to trust the memory of a judge engaged in trying a multitude of cases, even for a week, in regard to the evidence given or refused, or to the language he may have used in directing the jury. We submit, therefore, that there is no bill of exceptions here, on which the court can act; and that the judgment below must necessarily be affirmed.

If the court should think that the single word "excepted" has virtue enough to authorize it to conclude that the record shows affirmatively that the exceptions *were* taken on the trial, then we object that the exceptions are such as the rules of the law, and its own rules, will not *permit* the court to consider. They are sweeping and indiscriminate, being to the refusal to give long instructions, and to the giving of pages of legal principles and propositions in their stead. It surely will be *at some time* understood that this court will not look into a case which thus brings up a mass of instructions given and refused, and in which the party has put his finger on no particular errors. It is directly contrary to rule No. 4; and it is equally contrary to the law, and to the practice of all appellate courts of respectability. The rule will cease to be disregarded when it is rigidly enforced. To dispense with it, or overlook disobedience of it, on account of particular circumstances, makes it mere *brutum fulmen*.

There is no doubt that some portions, at least, of the charge and directions of the judge below, in this case, were correct in point of law. If he stated one correct proposition, the exception to his charge falls.*

2. *Of the contract made at Chattanooga, and the law as to common carriers, as set forth in the instructions given.*

The court instructed the jury that if the agent having charge of freights and their transshipment did make such a contract, it bound the company. This was right. The testimony shows that the company sent only one freight train each day, and that in the morning; but it *could* certainly

---

* Rogers v. The Marshal, 1 Wallace, 645; Harvey v. Tyler, 2 Id. 328.

send a car in the evening, with the freight train of the Nashville and Chattanooga road, if it chose to pay for the service; and if its agent contracted with a party owning freight to do so, the company would be responsible for all damage caused by the delay.

So the instructions as to the liability of the company as a common carrier. No matter what degree of prudence may be exercised by the carrier and his servants; although the delusion by which it is baffled, or the force by which it is overcome is inevitable, yet if it be the result of human means, the carrier is responsible.* In *Campbell* v. *Morse*,† one Deft's wagon, in which he was carrying for hire, stuck fast in fording a creek, and the water, rising suddenly, damaged the goods; but he was held responsible. So in *Bason* v. *Charleston & Columbia Steamboat Company*,‡ where a steamboat grounded from reflux of tide, and in consequence fell over, and the bilge-water, rising into the cabin, produced injury to the goods.

*Denny* v. *New York Central Railroad Company*, cited on the other side, is not against these cases, because the court there held that when the damages by flood occurred, the defendants no longer held the goods as common carriers.

In fact, the moment a faulty negligence begins, the carrier becomes an insurer against the consequences therefrom, both ordinary and extraordinary.§ If he improperly detains goods, and they are injured by a sudden and extraordinary rise of water, the detention being negligence, he is responsible. To relieve him there must be an entire exclusion of human agency from the cause of the injury or loss.‖ In *Read* v. *Spaulding*, cited below, the goods were injured by a flood, being delayed at a point *in transitu.*

---

* McArthur v. Sears, 21 Wendell, 196; Sherman v. Wells, 28 Barbour, 403 ; Ferguson v. Brent, 12 Maryland, 9.

† 1 Harper's Constitutional, 468.                    ‡ Id. 262.

§ Davis v. Garrett, 6 Bingham, 716; Bell v. Reed, 4 Binney, 127; Hart v. Allen, 2 Watts, 114; Williams v. Grant, 1 Connecticut, 492; Crosby v. Fitch, 12 Id. 410.

‖ Michaels v. Central Railroad Company, 30 New York, 570; Read v. Spaulding, 30 Id. 630; Merritt v. Earle, 29 Id. 115.

The fact, which in this case, with the windows of heaven opened, and the torrents descending day after day, ought to have been anticipated by the agents of the company, that the flood was coming, should have increased and stimulated their vigilance and caution, and if *by any known means* they could have prevented the damage, they should have done so.* What if the floods never did, within *their memory or their records*, rise so high? These calamities, like great fires in cities, are encyclical. They come at long intervals only; often very long intervals. But come at some time they surely will, and on such a premonition as was had *here*, the company should not have stood "stupidly gazing" at the menacing clouds till they burst and deluged the land. They should have moved the cars off at once to the farthest and highest spot possible, and if one route was blocked they should have gone in another.

When the negligence of the carrier exposes him to what he might otherwise have escaped, he is responsible for losses thus occurring through the combined agency of his own negligence and of inevitable accident. If his own neglect is the proximate cause of the peril being incurred, he is responsible. If he could have removed the property injured, beyond the reach of flood or fire, and so have escaped from that cause of loss, but did not do so, then, although the flood or fire was the act of God, yet the injury or loss was really caused by his negligence, and the accident was not *inevitable*. The fact that the carrier has done what is *usual*, is not sufficient to exempt him from a charge of negligence. He must show that he has done what was necessary to be done under all the circumstances. If he could have prevented the accident by the exercise of due diligence and care, and did not, he is liable.†

*Mr. Phillips in reply:* No doubt the bill of exceptions is open to animadversion, as not in good technical form. But it is certain that the exception to the action of the judge was

---

* Gordon *v.* Buchanan, 5 Yerger, 82.

† Wing *v.* New York & Erie Railroad Company, 1 Hilton, 235.

a "proceeding," and a very important one, and the opening of the bill declares that all the "*following proceedings*" were had "*on the trial of the cause.*"

It is again said, that the exceptions are too general, and that they should have been specifically made to the several charges. It is to be observed that the charges were asked in the first place by the defendant. These were rejected, and the defendant excepted. Then the court gave several charges, all involving the single question of negligence. The substance of these was a denial of the doctrine asserted in the prayers of the defendant, and to these instructions the defendant also excepted.

It is evident that the charges given are in direct response to the charges asked and refused, and no revision is now asked which involves a question that was not distinctly presented to the court below.

The court will not allow the right of review to be defeated because of any *mere* informality or irregularity in the mode in which the exceptions had been presented.*

Mr. Justice MILLER delivered the opinion of the court.

A preliminary point is raised by the defendant in error that the exception was not taken at the trial, but was taken afterwards on the overruling of a motion for a new trial.

It seems probable that the formal bill of exceptions was not signed or settled until after the motion was overruled, but it is a common practice, convenient in dispatch of business, to permit the party to claim and note an exception when the occasion arises, but defer reducing it to a formal instrument until the trial is over. We think the language of the bill implies that this was done in the present case, and that it is a reasonable inference from the language used at the beginning and end of this bill, that the *exceptions* were taken during the trial, as the rulings excepted to were made.

Comment is also made, that the exception does not point out to which instruction it is taken, nor to any special part

---

* Simpson & Co. *v.* Dall, 3 Wallace, 460.

of the charge which was given. But the instructions prayed by defendant were not offered as a whole, but each one for itself, and the action of the court in refusing them, to which exception is taken, may be fairly held to mean each of them.

As to the charge given by the court, the language of the exception is more general than we could desire. And if the errors of this charge were less apparent, or if there was any reason to suppose they were inadvertent, and might have been corrected if specified by counsel at the time, we would have some difficulty in holding the exception to it sufficient. But the whole charge proceeds upon a theory of the law of common carriers, as it regards the effect of loss from the act of God, on the contract, so different from our views of the law on that subject, that it needs no special effort to draw attention to it, and it is so clearly and frankly stated as to have made it the turning-point of the case.

We are of opinion, then, that both the refusal to charge as requested and the charge actually given are properly before us for examination. As regards the first, we will only notice one of the rejected instructions, the fourth. It was prayed in these words:

"When the damage is shown to have resulted from the immediate act of God, such as a sudden and extraordinary flood, the carrier would be exempt from liability, unless the plaintiff shall prove that the defendant was guilty of some negligence in not providing for the safety of the goods. That he could do so must be proven by the plaintiff, or must appear in the facts of the case."

It is hard to see how the soundness of this proposition can be made clearer than by its bare statement. A common carrier assumes all risks except those caused by the act of God and the public enemy. One of the instances always mentioned by the elementary writers of loss by the act of God is the case of loss by flood and storm. Now, when it is shown that the damage resulted from this cause immediately, he is excused.

What is to make him liable after this? No question of his negligence arises unless it is made by the other party. It is not necessary for him to prove that the cause was such as releases him, and then to prove affirmatively that he did not contribute to it. If, after he has excused himself by showing the presence of the overpowering cause, it is charged that his negligence contributed to the loss, the proof of this must come from those who assert or rely on it.

The testimony in the case, wholly uncontradicted, shows one of the most sudden, violent, and extraordinary floods ever known in that part of the country. The tobacco was being transported from Salisbury, North Carolina, to Memphis, on a contract through and by several railroad companies, of which defendant was one. At Chattanooga it was received by defendant, and fifteen miles out the train was arrested, blocked by a land slide and broken bridges, and returned to Chattanooga, when the water came over the track into the car and injured the tobacco.

The second instruction given by the court says that if, while the cars were so standing at Chattanooga, they were submerged by a freshet which no human care, skill, and prudence could have avoided, then the defendant would not be liable; but if the cars were brought within the influence of the freshet by the act of defendant, and if the defendant or his agent had not so acted the loss would not have occurred, then it was not the act of God, and defendant would be liable. The fifth instruction given also tells the jury that if the damage could have been prevented by any means within the power of the defendant or his agents, and such means were not resorted to, then the jury must find for plaintiff.

In contrast with the stringent ruling here stated, and as expressive of our view of the law on this point, we cite two decisions by courts of the first respectability in this country. In *Morrison* v. *Davis & Co.*,* goods being transported on a canal were injured by the wrecking of the boat, caused by

---

* 20 Pennsylvania State, 171.

an extraordinary flood. It was shown that a lame horse used by defendants delayed the boat, which would otherwise have passed the place where the accident occurred in time to avoid the injury. The court held that the proximate cause of the disaster was the flood, and the delay caused by the lame horse the remote cause, and that the maxim, *causa proxima, non remota spectatur*, applied as well to contracts of common carriers as to others. The court further held, that when carriers discover themselves in peril by inevitable accident, the law requires of them ordinary care, skill, and foresight, which it defines to be the common prudence which men of business and heads of families usually exhibit in matters that are interesting to them.

In *Denny* v. *New York Central Railroad Co.*,* the defendants were guilty of a negligent delay of six days in transporting wool from Suspension Bridge to Albany, and while in their depot at the latter place a few days after, it was submerged by a sudden and violent flood in the Hudson River. The court says that the flood was the proximate cause of the injury, and the delay in transportation the remote one; that the doctrine we have just stated governs the liabilities of common carriers as it does other occupations and pursuits, and it cites with approval the case of *Morrison* v. *Davis & Co.*

Of the soundness of this principle we are entirely convinced, and it is at variance with the general groundwork of the court's charge in this case.

As the case must go back for a new trial, there is another error which we must notice, as it might otherwise be repeated. It is the third instruction given by the court, to the effect that if defendant had contracted to start with the tobacco the evening before, and the jury believe if he had done so the train would have escaped injury, then the defendant was liable. Even if there had been such a contract, the failure to comply would have been only the remote cause of the loss.

---

* 18 Gray, 481.

But all the testimony that was given is in the record, and we see nothing from which the jury could have inferred any such contract, or which tends to establish it, and for that reason no such instruction should have been given.

JUDGMENT REVERSED AND A NEW TRIAL ORDERED.