**STANDARD BRANDS, Inc., v. BOSTON & M. R. R.**

No. 7201.

District Court, D. Massachusetts.

Oct. 10, 1939.

Edward A. Neiley, of Boston, Mass., and Donald M. Macaulay, of Springfield, Mass., for plaintiff.

Richard W. Hall,.of Boston, Mass., for defendant.

BREWSTER, District Judge.

This action is for damages to a shipment of coffee delivered to the New York, New Haven & Hartford Railroad Company in good order and condition, and delivered by the New Haven to the defendant in the same good order and condition. The amount of the damages is agreed upon. The only question is one of liability which is to be determined upon facts which, for the most part, are undisputed.

On March 17, 1936, the plaintiff delivered to the New Haven at New York City 250 bags of green coffee consigned to Standard Brands, Ltd., Montreal, Canada, via New York, New Haven & Hartford to Boston & Maine and to Canadian Pacific railroads, all common carriers by railroad. Plaintiff received bill of lading in the usual form, which contained provision that the carrier should not be liable for any damage to property in its possession caused by an act of God. The coffee was loaded on Boston & Maine car No. 71,362 and about 10 o'clock A. M. on March 18, 1936, the car was placed in the Brightwood yard of the defendant and remained in that yard until the coffee was damaged by contact with water.

The decisive issue is whether the defendant failed in its duty as common carrier in permitting the car to remain in the yard under the circumstances disclosed.

The defendant's Brightwood yard is located in that part of Springfield known as the "Brightwood District". Its tracks there are 61.90 ft. above mean low water at sea level. The Brightwood district is protected by a dike along the easterly side of the Connecticut River. In November, 1927, the river overflowed the dike and inundated the lower residential part of the district but did not reach the tracks of the defendant in the Brightwood yard. The maximum height reached at this time was 60.22 ft. above the Government basis of mean low water at sea level. Subsequently, the dike was rebuilt and reinforced and raised 2½ ft. above the 1927 level, so that in 1936 the waters of the river had to reach a height of nearly 63 ft. above the sea level basis before they overflowed the dike.

From a stipulation in the case, it appears that never since 1843 had the river reached the height of the 1927 flood. The average height of the river above the sea level basis was 42.26 ft.

On March 17, 1936, it was apparent to those operating the railroad that high water conditions were prevailing. On March 18, 1936, the river at Springfield had risen rapidly, especially during the early hours of the day, rising from 53.46 ft. at 8 o'clock A. M. to 61.36 ft. at midnight. The highest rate of the rise was during the forenoon and early afternoon of that day when, for a few hours, it was rising as rapidly as 6 inches an hour. After 4 o'clock P. M. it rose steadily until 2 o'clock A. M. on March 19, at an average rate of approximately 2½ inches per hour.

The Department of Streets and Engineering and the Police Department of the City of Springfield had, during the 18th, acting upon readings showing the rate of the rise of the river, decided late in the afternoon to warn the residents of Brightwood of the possibility that the area might be flooded and broadcast this warning over the radio and ordered, or requested, the residents to move to higher ground. As the river continued to rise until it was near the top of the dike, there was a general exodus from the district which continued up to the time the area was completely submerged.

According to statistics compiled by the United States Department of the Interior since the flood, it appears that at points north of Springfield on the Connecticut River the waters of the river continued to rise until after the cars in the defendant's Brightwood yard were flooded. At White River Junction the peak was reached about the time that the water overflowed the dikes. At points nearer Springfield, the peak was reached on the 19th, but the maximum height was maintained until the 20th, when the waters began to subside. In Springfield the crest came at 2 o'clock A. M. on the 20th, and the waters began to recede about 6 o'clock A. M. on that date. The water began to come over the dike into the Brightwood section of the city between 2 o'clock A. M. and 3 o'clock A. M. of the 19th, and within a comparatively short period of time that area was completely inundated.

The operation of the Connecticut River section of the Boston & Maine is directed from Greenfield. On the morning of March 18, acting upon orders received from Greenfield, the freight train scheduled to go north on the Boston & Maine at 6 o'clock A. M. on that day was can-

celed at 6.15 o'clock A. M. The last freight train that moved north was at 7.30 o'clock P. M. on the 17th and no train other than work trains moved north after 7 o'clock A. M. on the morning of the 18th until after plaintiff's goods were damaged. The reason for these orders was that the high waters and ice jams above Holyoke made the movement of heavy trains a dangerous operation. During the afternoon of the 18th, all communications between Greenfield and Springfield over the defendant's line were impossible due to the flood, and the facilities of the telegraph and telephone companies were crippled and overcrowded due to the emergency created by the flood. The result was that after the 18th there was no communication between the Greenfield and Springfield offices of the defendant. While the defendant's representatives at Greenfield could have obtained, and did obtain, some of the information available respecting the water conditions at points above Greenfield, they could not have imparted this information to the office in Springfield.

The Boston & Maine and the New Haven have an arrangement whereby switching service for both railroads in the Springfield yards is handled by the New Haven, including switching engines, crew and other facilities, all in charge of the yard-master of the New Haven at Springfield.

Those in charge of the Brightwood yard were the yard-master and the assistant night yard-master. This case concerns what these employees knew, or ought to have known, about the impending disaster, what they did and what alternatives were open to them.

The yard-master came on duty at 6.30 o'clock A. M. on the 18th. He knew that the freight train due to go north at 6.15 had been cancelled, and he must have known that the high water above Springfield was the cause. He had no information that would lead him to anticipate that an unprecedented flood was ahead. He was about the Brightwood yard, classifying cars and switching, that afternoon and early evening. At 6 o'clock P. M. he knew that the trains south on the New Haven had been cancelled due to the water on the tracks. These tracks are much lower than those in the Brightwood yard. He knew that the Atlantic & Pacific Tea Company had requested him to place cars on its spur track leading from the Brightwood yard to the Brightwood warehouse of the Company; that an order had come from the Boston office of the Atlantic & Pacific that the merchandise be moved to another warehouse located on higher ground; that that company had suffered some losses in other cities and did not wish to take any chances. The movement of freight from one Atlantic & Pacific warehouse to another in Springfield was not an unusual occurrence. The Atlantic & Pacific tracks at the Brightwood warehouse were lower than the defendant's track. The yard-master did not learn that the police had requested by radio or otherwise the residents of the Brightwood district of the city to evacuate or that they had begun to leave on the evening of the 18th. He testified that he did not think there was any danger in Springfield, but apparently he made no effort to ascertain the water levels or to obtain local information respecting the rapidity of the rise of the river.

The night assistant yard-master came on at 7 o'clock P. M. on the 18th. He had not learned of the radio warning to the residents in Brightwood. He knew that the river was high. He was in touch with the Police Department to find out if a rumor that the Holyoke dam had given way was true, and learned that it was not, but he knew that they were worried. There was no water in the Brightwood yard, and he thought the cars in the yard were protected by the dike. He knew of the transfer of goods from the Brightwood warehouse of the Atlantic & Pacific but did not know of the order to evacuate the residential section of Brightwood and did not see any residents moving out. He did not leave the tracks and had no opportunity to know what was going on in the streets. He had tried to contact the Greenfield office but was unable to do so. He found out through the defendant's Holyoke office the water conditions in Holyoke, but none of the information obtained throughout the evening led him to believe that the height of previous floods would be exceeded. He watched, somewhat casually, the rise of the river at Springfield as indicated by marks along the river bank. He made no attempt to get gauge readings from any city department. The Springfield office had a marker on Memorial Bridge, and during the early evening of the 18th the night yard-master knew from that source that the river was rising. After 8 o'clock P. M. he was in the Bright-

wood yard until about 2 o'clock A. M., when he went down the track to the New Haven yard. At that time no water had come into the Brightwood section. He noticed, however, at that time that there was considerable excitement in the vicinity of the yard. About 2.30 o'clock A. M. he was told that the water was coming into the Brightwood yard and he immediately returned to it. Upon arrival he found 5 feet of water over the track. It was then too late to avert the damage to the contents of the car. What happened after that is not important.

As to the alternatives, the New Haven tracks which connected with the Boston & Maine were either full or were equally submerged. The New Haven operates what is known as the "Highland Division". A small freight yard, a part of this Division, is on high ground and was not reached by the waters of the river during the 1936 flood. There were several cars already placed in this yard, and since there were 127 cars in the Brightwood yard at the time, it would not have been possible to have accommodated them all in this Highland Division yard without placing them upon the main line. There is no direct connection at Springfield between the main lines of the New Haven or between the lines of the Boston & Maine and Highland Division. It would be necessary to use the tracks of the Boston & Albany to move cars from the Brightwood yard to the Highland Division. This could not be done without the permission of the Boston & Albany. It does not appear that this permission would have been granted at that time of emergency. No such permission was sought, and no attempt was made to move any of the cars to the tracks of the Highland Division.

■ The initial carrier was the New Haven Railroad, but the defendant, as acting carrier, may be held liable notwithstanding the statutory right to sue the initial carrier. 49 U.S.C.A. § 20(11). Georgia, Florida & Alabama Ry. Co. v. Blish Milling Company, 241 U.S. 190, 36 S.Ct. 541, 60 L.Ed. 948; Cincinnati, N. O. & Texas Pacific Ry. Co. v. Rankin, 241 U.S. 319, 36 S.Ct. 555, 60 L.Ed. 1022, L.R.A.1917A, 265.

■ The bill of lading issued by the initial carrier, however, governs the entire transaction and fixes the obligation of all participating carriers. Georgia, Florida & Alabama Ry. Co. v. Blish Milling Company, supra.

The terms of the bill of lading issued to the plaintiff excluded liability for damage caused by an act of God.

■ In the Federal courts, if it is shown that the loss was occasioned by an excepted cause, then the plaintiff assumes the burden of proving that the carrier was negligent and that such negligence directly and approximately contributed to the result. Memphis & C. Railroad Co. v. Reeves, 10 Wall. 176, 19 L.Ed. 909; Western Transportation Co. v. Downer, 11 Wall. 129, 20 L.Ed. 160; Schnell v. Vallescura, 293 U.S. 296, 299, 55 S.Ct. 194, 79 L.Ed. 373; Empire State Cattle Co. v. Atchison, Topeka & Santa Fe Railway Co., C.C., 135 F. 135.

In Schnell v. Vallescura, supra, the rule is stated as follows:

"Once the damage has been shown to fall prima facie within the exception, the burden is upon the goods' owner to show, not merely negligence on the part of the carrier, even though concurring negligence, but, in addition, that such negligence was the efficient cause of the loss; that the loss could have been avoided or prevented by the exercise of due skill and care on the part of the carrier."

■ In the case at bar it must be conceded that the flood was unprecedented. The high water levels of the river had never, so far as recorded, reached the height of the 1936 flood. The disaster was wholly attributable to causes beyond the control of human agencies. It clearly was an act of God within the meaning of the contract between the shipper and the carrier and would exonerate the latter unless the plaintiff has sustained its burden of proving that the negligence of the defendant's agents or servants intervened to such an extent as to amount to an approximate and direct cause of the loss. The precise questions, therefore, are whether defendant's agents or servants failed to exercise the care and diligence of reasonable persons similarly situated (a) in anticipating the danger; (b) in taking adequate measures to prevent the water damage to the coffee; and (c) whether such failure can be deemed the approximate cause of that damage.

■ It can hardly be seriously contended that the yard-masters actually anticipated that the waters would cover the Bright-

wood yard to such a depth as to reach the floors of the cars which are above the level of the track. If they acted upon the belief that the cars in the Brightwood yard were not in danger, there was much to justify that belief. The flood of 1927, when the waters of the Connecticut River reached the highest level then known, had not covered the tracks of the yard. The dike had been raised 2½ ft. above this highest level. There was no indication that the dike would not hold, and if it did break it would not necessarily follow that the tracks in the yard would be inundated to a depth sufficient to reach the contents of the car.

The yardmasters had no means of ascertaining when the peak of the flood had passed above Springfield, as all means of communication with northern points had been cut off early in the day.

To argue that the yardmasters were negligent in failing to anticipate the extreme rise of the river is to apply a standard of diligence somewhat beyond that which the law commands.

■ Plaintiff lays emphasis on the fact that they knew of the precautionary measures adopted by the Atlantic & Pacific Company in transferring goods to another warehouse and those adopted by the city officials in ordering the evacuation of the residents in the Brightwood District.

Plaintiff argues that the possession of this knowledge with what was known about the rapidity and constancy of the rise of the river created a duty to move the cars out of the Brightwood yard on to higher ground.

■ The due diligence of the defendant's agents is not to be determined with reference to what another individual may have apprehended or what measures he may have taken by way of precaution. The test is what, under all the circumstances of the case, would the reasonably prudent man have done under like circumstances.

Furthermore, the officers of the city were dealing with possibilities affecting the safety of its residents. A break in the dike or an overflow would surely endanger the residents in homes much lower than the tracks of the Brightwood yard, and the Atlantic & Pacific Tea Company could have sustained serious damage from water before the flood would reach the cars on defendant's track.

If the decision turned upon the failure of the defendant's employees to anticipate the extent to which the high water of 1936 would exceed the highest recorded level, I would not be able to conclude on the facts of the case that such failure would deprive the defendant of its right to invoke the provisions of the contract excepting liability for damages arising from the acts of God.

This conclusion is further required because the failure cannot be deemed to be the direct and approximate cause of the damage.

■ Assuming that there was negligence in not apprehending the possibilities of danger, such negligence could not have contributed to the damage if there were available no reasonable means of avoiding the consequences. There were 127 cars in the Brightwood yard. The defendant owed no greater duty to the plaintiff's shipment than it did to other shipments liable to be injured by contact with water. The other tracks of the defendant were either full or submerged. The evidence shows that there were no tracks of either the defendant or the New Haven on higher ground available except the tracks in the "Highland Division" yard and the main tracks of the said "Highland Division" of the New Haven. If the arrangement between the New Haven and the defendant, relative to switching service for both railroads, allowed the defendant to use the tracks of the Highland Division without permission, it appeared beyond dispute that, in order to transfer cars from the defendant's yard to the Highland Division, it was necessary to move them over tracks of the Boston & Albany, and this could not be done without the express consent of that railroad. There was no evidence that such consent would have been given. The probabilities are against it, in view of the exigencies created by the flood.

■ The burden is on the plaintiff to prove that the defendant could have avoided the consequences by adopting reasonably preventive measures. The evidence falls short of sustaining this burden. It has been held that the negligent failure to forward a shipment (Memphis & C. Railroad Co. v. Reeves, supra) or the negligent failure to notify consignee of the arrival of a shipment (Hadba v. Baltimore & Ohio R. Co., 183 App.Div. 555, 170 N. Y.S. 769) did not constitute an approximate cause when the shipments were lat-

er caught and damaged by the waters of a flood. The carrier was not held liable in either case.

The plaintiff relies upon the case of Chesapeake & Ohio Railway Co. v. Walton, 4 Cir., 99 F.2d 270. The law as applied to the facts of that case is not inconsistent with my conception of the law governing the case at bar. The Chesapeake & Ohio case is clearly distinguishable upon the facts. There preventive measures were readily at hand, and the question whether the failure of the Railroad to have recourse· to these measures was properly submitted to the jury.

Judgment may be entered for the defendant.