## MISSOURI-KANSAS-TEXAS R. CO. OF TEXAS v. ROEGELEIN PROVISION CO.

No. 12551.

Court of Civil Appeals of Texas. San Antonio.

June 24, 1953.

Rehearing Denied Sept. 2, 1953.

Eskridge, Groce & Hebdon, San Antonio, for appellant.

Davis, Clemens, Knight & Weiss, San Antonio, for appellee.

NORVELL, Justice.

This is an action brought against Missouri-Kansas-Texas Railroad Company of Texas (the Texas Katy) as terminal carrier, under the provisions of 49 U.S.C.A., § 20(11), for the loss of twenty-three prime and choice fat steers owned by appellee. The loss occurred in and about Kansas City, Missouri, in July of 1951. Appellee, Roegelein Provision Company loaded forty-four steers at Omaha, Nebraska, and consigned the same to San Antonio, Texas. The Uniform Live Stock Contract prescribed by the Interstate Commerce Commission for use in cattle shipments, instead of the Uniform Bill of Lading, was applicable to the shipment. This agreement contained the following provision:

"Sec. 1(a). Except in case of its negligence proximately contributing thereto, no carrier or party in possession of all or any of the live stock herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, the inherent vice, weakness or natural propensity of the animal, or the act or default of the shipper or owner, or the agent of either, or by riots, strikes, stoppage of labor or threatened violence."

Appellant, in order to secure the right to open and close, admitted that twenty-three of the forty-four steers shipped at Omaha were never delivered to appellee at San Antonio, and that the same had a market value of $9,186.74, but pleaded affirmatively that Roegelein was not entitled to recover because the loss sustained by it was the result of an act of God for which appellant was not responsible.

The pertinent issues and the jury's answers thereto were as follows:

"Special Issue No. 1: Do you find from a preponderance of the evidence that the

flood in the central industrial area of Kansas City on July 13, 1951, was an act of God? Answer: Yes.

"Special Issue No. 2: Do you find from a preponderance of the evidence that the loss of the plaintiff's cattle, if they were lost, was caused by such act of God? Answer: No.

"Special Issue No. 3: Do you find from a preponderance of the evidence that the receiving railroad (Missouri-Pacific) was negligent in taking plaintiff's cattle into Kansas City on July 11, 1951? Answer: No.

"Special Issue No. 5: Do you find from a preponderance of the evidence that any railroad to which plaintiff's cattle were delivered or over whose line or lines such cattle passed (except Kansas City Southern, if plaintiff's cattle passed over its line) was negligent in failing to notify other railroad (sic) of the condition of its or their lines in, around and south of Kansas City during the period of July 10 to July 13, 1951? Answer: Yes.

"Special Issue No. 7: Do you find from a preponderance of the evidence that any railroad to which plaintiff's cattle were delivered or over whose line or lines they passed (except the Kansas City Southern, if plaintiff's cattle passed over its line), or any agent of any such railroad, was negligent in failing to notify plaintiff that plaintiff's cattle has been rerouted on July 11, 1951? Answer: Yes.

"Special Issue No. 9: Do you find from a preponderance of the evidence that any railroad to which plaintiff's cattle were delivered or over whose line or lines such cattle passed (except the Kansas City Southern, if plaintiff's cattle passed over its line) or any agent of any such railroad failed to properly feed and water plaintiff's cattle in Kansas City? Answer: Yes.

"Special Issue No. 14: Do you find from a preponderance of the evidence that any railroad to which plaintiff's cattle were delivered or over whose line or lines such cattle passed (except the Kansas City Southern, if plaintiff's cattle passed over its line), was negligent in failing to get plaintiff's cattle out of Kansas City before 10:30 A. M., July 13, 1951? Answer: Yes.

"Special Issue No. 16: Do you find from a preponderance of the evidence that any railroad to which plaintiff's cattle were delivered or over whose line or lines such cattle passed (except the Kansas City Southern, if plaintiff's cattle passed over its line), failed to advise plaintiff that causes existed that would probably delay the transportation of said cattle? Answer: Yes."

Corollary issues of proximate cause (and negligence as to Issues Nos. 9 and 16) were answered in the affirmative.

Judgment for the sum of $9,186.74 plus interest was rendered on the verdict.

Appellant attacks the judgment by means of seven points which present the following contentions:

"1. It appears as a matter of law that a flood in the central industrial district of Kansas City on July 13, 1951, caused the loss of appellee's cattle.

"2. All other acts or omissions of the carriers involved, including those found by the jury (with perhaps the exception of the jury's answer to Special Issue No. 9) and all others possibly suggested by the evidence, could not legally be considered as *causes* of the loss of appellee's cattle.

"3. The jury's answer to special issue No. 9, relating to the watering and feeding of the cattle is supported by *no* competent evidence.

"4. The argument of appellee's attorney was improper in that therein counsel argued that matters which as a matter of law could not be causes of appellee's losses, could be and were responsible for the loss of the cattle. (This ground is similar in nature to the second ground above set out, and is alternative to the other contentions set forth in that the sustaining thereof would result in a remand of the case rather than a rendition of judgment for appellant.)"

We are of the opinion that the evidence conclusively establishes that the flood of the central industrial area of Kansas City was an act of God (as found by the

jury), and that the loss of appellee's cattle was caused by such act of God. The appellant established its defense under the provisions of the Uniform Live Stock Contract, unless it can be said that the case comes within the exception contained in the contract, in that the negligence of the carrier proximately contributed to the loss.

The floods in and about Kansas City during the summer of 1951 were catastrophes of a magnitude that attracted national attention. The progress and development of these river overflows were exhaustively covered by newspaper accounts and governmental reports, both before and after the event. Despite confusion as to details naturally accompanying such a disaster, information relating to the facts and circumstances surrounding the floods was largely available to both sides of this controversy and there is but little conflict of evidence as to controlling issues.

Two carloads of steers, comprising forty-four head, were delivered to the Missouri Pacific Railroad on July 10, 1951, by an agent of Roegelein for through shipment to San Antonio. The cattle arrived in Kansas City on the morning of July 11th. At that time severe floods were occurring upon the Blue and Kaw (Kansas) rivers in and about Kansas City. Certain abortive attempts were made by the Missouri Pacific and Missouri-Kansas-Texas Railroad Company (the big Katy) to get the cattle out of Kansas City over the Katy lines and those of the Kansas City Southern. It appears that one carload of steers owned by the Hormel Company was taken from the Kansas City yards and transported to St. Louis over the Missouri Pacific, but the Roegelein cars were not attached to this train or any other which left Kansas City for the east during the 11th or 12th of July. Attempts to complete the transportation of the Roegelein cattle had ended in failure with the result that said cattle were in the Kansas City stockyards on Friday morning, July 13th.

Here it should be emphasized, as one of the controlling features of the case, that from the time the Roegelein cattle arrived in the Kansas City stockyards until the morning of July 13th, these stockyards were regarded as a place of safety in the midst of a flood-stricken area. The various attempts of the carriers to take the cattle from Kansas City seemingly arose out of a desire to complete transportation agreements rather than to remove the cattle from the stockyards as a possible place of danger.

From the beginning of the floods in and around Kansas City, until the morning of July 13th, there was no notice or warning that a flood was expected in the central industrial district of Kansas City where the stockyards were located. The Kansas City Times, on the morning of July 13th, reported that, "There is no danger to the central industrial district on the Missouri side from the flooding Kaw River, Colonel R. P. West, acting Chief of the Kansas City District of Army Engineers, said early today." The President of the Kansas City Stockyards, J. B. Dillingham, testified that on July 12th, he began making regular telephone calls to the Army Engineers who were in general charge of the flood threatened area and the United States Weather Bureau, for the purpose of ascertaining the rise and fall of the flood on the Kaw River and apprehending any threatened danger to the rail connections leading into and out of the city or to the stockyards themselves. During the night of the 12th and morning of the 13th, he called the U. S. Corps of Engineers "oftener than once every hour." Until after 9 o'clock the central industrial area was considered safe, but thereafter conditions rapidly worsened. About 9:45 a. m. the army engineers issued an evacuation order applicable to the central industrial area and announced that the Kaw would top its levees.

There is no evidence in the record indicating that the flood of the central industrial area of Kansas City was caused by anything other than a wholly unexpected and unprecedented rise in the waters of the Kaw River. The onslaught of the flood was so overwhelming that it came over the top of the levee "for a distance of three quarters of a mile." The water came "in a wave."

Dillingham testified that after inspecting the river about eight o'clock in the morning

and prior to the evacuation proclamation of the Army Engineers, he commenced the removal of cattle from the ground level by taking them to the third or top floor of a concrete hog house within the yards. Approximately 3900 cattle were moved into the concrete structure and none were left upon the ground. Food waters soon covered the stockyards area to a depth of sixteen to twenty feet and it became impossible to bring water and food to the cattle for a period of about three days. The temperature on July 14th in the area ran from 115 to 120 degrees Fahrenheit and many of the cattle on the top floor of the concrete hog house died from lack of water, overheating and exposure.

Evacuation of the cattle from the hog house in the flooded stockyards commenced on Monday, July 16th and was finally completed by one p. m. Tuesday. All of the surviving cattle were taken to the Prospect Feed Yards, which were under the control of the Missouri Pacific and had escaped inundation.

There was testimony that on the morning of July 13th the Roegelein cattle were moved to pens Nos. 95 and 96 in Block 80, which was on the top of the concrete hog house. One witness thus described the condition of the cattle at the time of their evacuation on Monday, July 16th: "The cattle were panicky. They were frothing at the mouth. Some of the cattle, when you would go into the pen and try to drive them out, they would fight you, they were so hot." (This witness saw some fifteen or sixteen cattle dead in pens Nos. 95 and 96. At one place his testimony was as to each pen, but in the latter part of his account, it is made clear that the fifteen or sixteen included the cattle found dead in both pens). The Roegelein cattle were transported to the Prospect Yards with Holsteins, from which they were readily distinguishable, and four or five died on the way out or after they had arrived in the latter yards.

The statement of facts indicates some confusion of cattle as well as difficulty of identification in minor particulars, but the dominant picture presented by the testimony is that of a sudden overwhelming disaster occasioned by an unprecedented flood of the Kaw River and the unexpected overtopping of the levees. The resulting inundation rendered inoperative the facilities for providing pure water, food and care for the unfortunate animals trapped by the forces of nature.

With reference to a similar situation arising from the Galveston flood of 1900, Mr. Justice Gill, writing for the Court of Civil Appeals, in International & Great Northern Railroad Co. v. Bergman, 64 S.W. 999, 1001, said:

"The proof in this case shows that the place where the cotton was stored could be relied on as a safe place for it under usual conditions. While the testimony shows that it was possible to deliver it on the 8th, it also appears without dispute that on the morning of the 8th the bad weather deterred the draymen from outdoor work, and that there was then no apprehension of loss of the cotton. Nor is it made to appear, or even contended, that, after the danger from the storm became apparent, there was any safer place for the cotton than where it then was. * * Thus the facts and the nature of the disaster furnish not only a further reason why we should hold the defendant acquitted of blame, unless the plaintiff shall make it affirmatively appear that there was negligence after the danger was discovered, but excludes the idea that such negligence could be shown. Indeed, appellee does not complain that defendant discovered the threatened peril, and failed to care for the safety of the cotton, but complains only that delivery could have been made as late as the 8th."

The cattle involved were moving in interstate commerce and the rules set forth in Standard Brands v. Boston & Maine Railroad, D.C., 29 F.Supp. 593, 596, are applicable. It was said:

"In the Federal courts, if it is shown that the loss was occasioned by an excepted cause, then the plaintiff assumes the burden of proving that the carrier was negligent and that such

negligence directly and approximately contributed to the result. Memphis & C. Railroad Co. v. Reeves, 10 Wall. 176, 19 L.Ed. 909; Western Transportation Co. v. Downer, 11 Wall. 129, 20 L.Ed. 160; Schnell v. Vallescura, 293 U.S. 296, 299, 55 S.Ct. 194, 79 L.Ed. 373; Empire State Cattle Co. v. Atchison, Topeka & Santa Fe Railway Co., C.C., 135 F. 135.

"In Schnell v. Vallescura, supra, the rule is stated as follows:

" 'Once the damage has been shown to fall prima facie within the exception, the burden is upon the goods' owner to show, not merely negligence on the part of the carrier, even though concurring negligence, but, in addition, that such negligence was the efficient cause of the loss; that the loss could have been avoided or prevented by the exercise of due skill and care on the part of the carrier.' [1]

"In the case at bar it must be conceded that the flood was unprecedented. The highwater levels of the river had never, so far as recorded, reached the height of the 1936 flood. The disaster was wholly attributable to causes beyond the control of human agencies. It clearly was an act of God within the meaning of the contract between the shipper and the carrier and would exonerate the latter unless the plaintiff has sustained its burden of proving that the negligence of the defendant's agents or servants intervened to such an extent as to amount to an approximate and direct cause of the loss. The precise questions, therefore, are whether defendant's agents or servants failed to exercise the care and diligence of reasonable persons similarly situated (a) in anticipating the danger; (b) in taking adequate measures to prevent the water damage to the coffee; and (c) whether such failure can be deemed the approximate cause of that damage."

It appears that insofar as could be reasonably foreseen, the Roegelein cattle were in a place which was safe until the morning of July 13th. Until that time there was no notice of an impending flood of the district. The special issues submitted at appellee's request and answered favorably to it for the most part relate to matters of alleged negligence which resulted in the cattle's being in the Kansas City stockyards on July 13th, when the flood occurred. This is readily apparent insofar as Special Issues Nos. 5, 7 and 14 are concerned. In other words, these issues relate to negligence resulting in a delay of the transportation of the cattle out of Kansas City prior to 10:30 a. m. on July 13th. The same condition is likewise true as to the answer to Special Issue No. 16, relating to an alleged failure to notify appellee that causes existed which would probably delay the transportation of the cattle. If we assume that prompt notification would have resulted in the cattle being removed from the Kansas City stockyards prior to the flood, the legal situation would not be varied. In this connection, it may be said that although there was evidence that some owners of livestock or their agents knew of the presence of their cattle in the pens on the top of the hog house and stayed with the cattle, there is no evidence that such persons did or could get suitable water or feed to their cattle. The evidence to the contrary indicates that it was impossible to do so.

Special Issue No. 9 is specifically attacked by the appellant as being without support in the evidence. This issue relates to the

1. The above quotation is from the report of the argument in Schnell v. Vallescura. See 293 U.S. 299. While the opinion cites Clark v. Barnwell, 12 How. 272, 280, 13 L.Ed. 985, 988; Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 189, 190, 19 L.Ed. 909, 912, 913; Western Transp. Co. v. Downer, 11 Wall. 129, 134, 20 L.Ed. 160, 161; The Victory, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519, 528; Cau v. Texas & P. R. Co., 194 U.S. 427, 432, 24 S.Ct. 663, 48 L.Ed. 1053, 1057, and Republic of France v. French Overseas Corp. (The Malcolm Baxter, Jr.) 277 U.S. 323, 334, 48 S.Ct. 516, 72 L.Ed. 901, 905, which support the quotation, the holding of Schnell v. Vallescura was that the efficient cause of the loss was not shown to be an excepted peril.

alleged failure to properly feed and water appellee's cattle in Kansas City.

 In our opinion, the evidence is insufficient as a matter of law to either raise or carry the issue. Upon the trial it was shown that the waybill covering the cattle disclosed only that the cattle were fed and watered at a place called Bellmead, near Waco, Texas, on July 21, 1951. Counsel then read into the record (over an objection apparently not ruled upon by the court), an excerpt from a circular of the Interstate Commerce Commission requiring that, "when livestock in transit is stopped for feeding, watering and rest at other than railroad operated stockyards, the actual charges made by such yard shall be assessed against the shipment and shall be paid by the attendant in charge, or must be entered on the waybill as feed and service charge." It seems that the Kansas City stockyards were operated by a company or corporation which acts as an agent for and on behalf of the railroads serving the city. If the Kansas City yards be considered as "other than railroad operated stockyards" the mere failure of the waybill to contain a notation of charges for feeding is but slight, if any, evidence (standing alone) that the cattle were not fed or watered.

As supporting the theory that the cattle were not fed and watered in the Kansas City yards before they were taken to the hog house, appellee in its brief refers to the testimony of an official of the M. K. & T. Ry. Co., and another of the Missouri Pacific, wherein they stated that they did not know of their own knowledge that the cattle had been fed and watered. The Katy official, designated as a "live stock agent," testified that: "I don't go down to the stock yards. I don't see the cattle. I don't see them fed. I don't see the water troughs and (therefore) I could not say for sure that they are fed and watered." Similar testimony was given by a Missouri Pacific superintendent. Both, however, stated that the feeding and watering was supposedly done by the Kansas City Stockyards Company, and an official of that company testified that the available records of that organization showed that the cattle were watered and fed on July 11th and 12th.

It takes more than a mere showing of confusion and a failure to make book entries to establish negligence. International & Great Northern Railroad Co. v. Bergman, Tex.Civ.App., 64 S.W. 999. A finding based upon testimony whose probative force is so weak that it "only raises a mere surmise or suspicion" can not stand as such evidence falls short of being "any evidence." Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063. Jurors may not be "turned loose in the domain of conjecture as to what may by possibility ensue from a given statement of facts." Galveston, Harrisburg & San Antonio Ry. Co. v. Powers, 101 Tex. 161, 105 S.W. 491, 493; Continental Cas. Co. v. Fountain, Tex.Civ.App., 257 S.W.2d 338.

The contention that appellee's cattle were retained in the cars for longer times than necessary prior to July 13th stands upon similar ground. It is not shown that the thirty-six-hour agreement as to cattle remaining in the cars, as permitted by the Live Stock Transportation Act, 45 U.S. C.A. § 71, was violated. To say that the loading and re-loading of the cattle proximately contributed to their destruction is to again speculate without the necessary evidentiary support. This theory was not specifically submitted to the jury, but is argued in the brief in support of the contention that the unprecedented flood was not the cause of the loss of the cattle.

██ It might also be said that this is not a suit for deterioration or damage to cattle by reason of negligent delay in transit. It is a suit for the market value of cattle which were lost and destroyed. We recognize of course that cattle, especially fat steers, are highly perishable property, much more so than bales of cotton or sacks of coffee. However, the rule is that when at the time of destruction, the place of location of the livestock or other property is one which has heretofore been a safe place and there is no reasonable expectation that it will become an unsafe place, negligent acts or omissions which prevented such property from having been theretofore taken from such place are not proximate causes of the loss of the property when destroyed by a

sudden and unexpected act of God. Memphis & Charleston Railroad Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909; St. Louis, Iron Mountain & Southern Ry. Co. v. Commercial Union Ins. Co., 139 U.S. 223, 11 S.Ct. 554, 35 L.Ed. 154; International & G. N. R. Co. v. Bergman, Tex.Civ. App., 64 S.W. 999; Gulf Colorado & Santa Fe Railway Co. v. Darby, 28 Tex. Civ.App. 229, 67 S.W. 129; Ft. Worth & Denver City Railway Co. v. Lemons, Tex. Civ.App., 258 S.W. 1095; Bergman Produce Co. v. American Railway Express Co., Tex.Civ.App., 262 S.W. 891; Farr Co. v. Union Pacific Railway Co., 10 Cir., 106 F.2d 437.

By way of summation, we hold, (a) that it appears as a matter of law that the loss of plaintiff's cattle was caused by an act of God, namely, the flood in the industrial area of Kansas City on July 13, 1951, (b) that there is *no* evidence supporting the jury's answer to Special Issue No. 9, and (c) that the acts or omissions inquired about in Special Issues Nos. 5, 7, 14 and 16, could not legally be considered as proximate causes of the loss of appellee's cattle. It, therefore, becomes our duty to render such judgment as should have been rendered by the trial court, to-wit, that appellee take nothing.

In order to complete the statement of our views as to the case, we will say that it naturally follows that the alternative point, relating to improper argument, must be sustained. The bill of exception setting forth the argument complained of discloses that appellee's attorney in arguing Special Issue No. 2 and contending that an act of God was not the cause of the loss of appellee's cattle, said:

"Now, gentlemen, I mean there is no evidence—I guess it is undisputed— that none of these cattle were drowned in the flood the day that the flood hit Kansas City. It seems to me that this cinches that, that the evidence establishes that the answer to Question No. 2 should be no. *The day the flood hit Kansas City those cattle should have been in San Antonio,* Texas. In other words, it was the mishandling of the cattle during the two days that preceded July 13th that caused the loss, if there was a loss, I mean if the cattle were destroyed by the flood, it was by the negligence that occurred during the two preceding days and by the act of the railroad, the mishandling of the railroad, and circumstances like that, that caused the loss, rather than this flood that they had in the Kansas City area."

This argument was objected to on the ground that the delay in getting the cattle out of Kansas City "as a matter of law could not be a proximate cause." The objection was overruled and a full and "running" bill allowed to this and similar arguments. The substance of the argument above set forth was repeatedly urged upon the jury, and it is reasonably probable that the same resulted in a negative answer to Special Issue No. 2, which answer we have held was squarely against the undisputed *competent* evidence relating thereto.

We agree with appellant's contention that the argument was objectionable as stating that certain matters were proximate causes which under the law could not be proximate causes, for, as stated by this Court in Bergman Produce Co. v. American Ry. Express Co., 262 S.W. 891, 894:

"Negligent delay cannot be regarded the proximate cause of loss by a casualty constituting in itself an act of God, though had there been no negligent delay there would have been no damage. There is no legal duty imposed upon the carrier to guard against what cannot be foreseen, because negligent delay in such a case, while a remote cause is not a proximate cause of the loss. Negligent delay cannot be regarded as the proximate cause of an ultimate loss by a casualty constituting in itself an act of God, although had there been no negligent delay the property would not have been subjected to such casualty."

In accordance with Rule 434, Texas Rules of Civil Procedure, the judgment appealed from is reversed and judgment here rendered that appellee take nothing.